**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **RANDALL I. MILLER and BRENDA D. MILLER**<br><br>***Plaintiffs,***<br><br>**v.**<br><br>**SMITTY'S SUPPLY, INC.; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; U.S. ENVIRONMENTAL PROTECTION AGENCY; CHAD TATE, individually and in his official capacity as President of Smitty's Supply, Inc.; CRAIG ELLISON, individually and in his official capacity as Director of Compliance of Smitty's Supply, Inc.; JON LORIO, individually and in his official capacity as Chief Operating Officer of Smitty's Supply, Inc.; EDGAR R. SMITH III, individually and in his official capacity as Vice President of Smitty's Supply, Inc.; CAM2 INTERNATIONAL, L.L.C.; CAM2 HOLDING COMPANY, L.L.C.; SMITH & TATE HOLDINGS, L.L.C.; SMITH & TATE INVESTMENTS, L.L.C.; LATCH OIL, INC.; WARREN CHEMICAL CORPORATION; ADDITIVES PLUS, L.L.C.; CMS CHEMICALS, LLC; LEE ZELDIN, individually and in his official capacity as Administrator of the U.S. Environmental Protection Agency; SCOTT MASON, individually and in his official capacity as Regional Administrator of U.S. Environmental Protection Agency, Region 6; COURTNEY J. BURDETTE, individually and in her official capacity as Secretary of the Louisiana Department of Environmental Quality; and DR. AMANDA VINCENT, individually and in her official capacity as Director of the Office of Environmental Services, Louisiana Department of Environmental Quality**<br><br>***Defendants.*** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. ______________**<br><br>**SECTION:**<br><br>**JUDGE:**<br><br>**MAGISTRATE JUDGE:** |

**PLAINTIFFS' ORIGINAL COMPLAINT**

## I. INTRODUCTION

1. Plaintiffs bring this civil action seeking monetary damages, civil penalties, declaratory relief, restraining, injunctive relief, mandatory prospective injunctive relief, and all other available relief against Defendants for violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*; the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, 9607, 9613; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972; the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.*; the Louisiana Environmental Quality Act ("LEQA"), La. R.S. 30:2001 *et seq.*; the Louisiana Civil Code; and the Fifth and Fourteenth Amendments to the United States Constitution, U.S. Const. amends. V, XIV, enforceable through 42 U.S.C. § 1983, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

2. Plaintiffs also seek relief under Louisiana Civil Law for trespass and nuisance. On August 22, 2025, a catastrophic explosion and fire broke out at Smitty's lubricant oil manufacturing facility in Roseland, Tangipahoa Parish, Louisiana (the "Facility"). The fire burned for over two weeks. Firefighters did not fully extinguish it until September 8, 2025. *See* U.S. Env't Prot. Agency, Region 6, RCRA Compliance Evaluation Inspection Report: Smitty's Supply, Inc., Roseland, LA, EPA ID No. LAR000078691, at 2 (Dec. 3, 2025) [hereinafter "Exhibit C"]. The explosion and fire (the "Incident") discharged the following pollutants into the air, surface waters, groundwater, and soils of Tangipahoa Parish and Plaintiffs' property: oil and other petroleum substances and products; hazardous substances including RCRA metals, chlorinated materials and compounds that contain benzene, and phthalates; per- and polyfluoroalkyl substances ("PFAS"), which was a part of firefighting foam used in the response and released through controlled discharges and may have been used at Smitty's; and other pollutants. These contaminants reached

Plaintiffs' property (hereinafter, "the Property"), the channels, and bar ditches throughout Roseland, then went into the Tangipahoa River, which flows south toward Lake Pontchartrain. U.S. Env't Prot. Agency, Pollution/Situation Report No. 1, Smitty's Supply Fire, Roseland, LA, at 1 (Aug. 23, 2025) (documenting discharged materials traveled into Tangipahoa River) [a true and correct copy is attached hereto as "Exhibit A"]. The contamination continues today in the form of contaminants remaining throughout Roseland and on the Millers' property.

3. The Millers seek full compensation. They suffered and continue to suffer personal injury, property damage, emotional distress, mental anguish, loss of use and enjoyment of their property, diminution in property value, medical expenses, response costs, and loss of livestock. They seek the full extent of special, punitive, exemplary, and compensatory damages where the law permits.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); § 304(a) of the CAA, 42 U.S.C. § 7604(a); § 7002(a) of RCRA, 42 U.S.C. § 6972(a); § 1449 of the SDWA, 42 U.S.C. § 300j-8; § 113(b) of CERCLA, 42 U.S.C. § 9613(b); 42 U.S.C. § 1983; and the APA, 5 U.S.C. §§ 701–706.

5. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal claims alleged herein that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b) because the Facility is located in this District, the events giving rise to Plaintiffs' claims occurred in this District, Defendants Smitty's, Tate, Ellison, Lorio, and Smith, and the SACDs, do business in this District, Smitty's and the SACDs maintain their principal places of business in the District, the real and personal property that was damaged is in the District, the personal injuries that

occurred and are ongoing are in the District, and a substantial part of the events or omissions giving rise to the claims against the Federal Defendants and the State Defendants occurred in this District.

7. Under 42 U.S.C. § 9613(b) venue in the Eastern District is proper because it is the district "in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office."

8. Venue also exists under 42 U.S.C. § 6972(a)(2) because the Eastern District of Louisiana is the district in which "the alleged violation occurred or the alleged endangerment may occur."

9. Plaintiffs provided formal notice of intent to sue pursuant to § 505(a) of the CWA, 33 U.S.C. § 1365,[1] and 40 C.F.R. Part 135; § 304 of the CAA, 42 U.S.C. § 7604, and 40 C.F.R. Part 54; § 7002(b) of RCRA, 42 U.S.C. § 6972(b), and 40 C.F.R. Part 254; and § 1449 of the SDWA, 42 U.S.C. § 300j-8, and 40 C.F.R. Part 135, on or about May 20, 2026 (the "Notice"). A copy of the Notice is attached hereto as Exhibit B. More than ninety (90) days have elapsed since notice was served, and neither the Administrator of U.S. EPA nor LDEQ has commenced and is diligently prosecuting a civil action to redress the CAA violations, RCRA violations, and SDWA violations alleged herein. And neither the U.S. EPA nor LDEQ brought an administrative enforcement action for CWA violations against Smitty's.

10. Plaintiffs further allege the prospective injunctive and declaratory relief sought against Defendants U.S. EPA, Zeldin, and Mason in their official capacities in the Twelfth through Fifteenth Causes of Action below are equitable remedies available directly under the APA,

[1] Because the United States and the State of Louisiana have brought a civil action under the CWA, Plaintiffs understand "no action may be commenced" by Plaintiffs at this time. *See* 33 U.S.C. (365(b)(1)(B)). Plaintiffs do not elect to sue under Section 1365(b)(1)(B) but reserve the right to do so, or to bring their own action, should circumstances change.

5 U.S.C. §§ 702, 706, and the SDWA's citizen-suit provision, 42 U.S.C. § 300j-8, and are not *Bivens* remedies.

## III. THE PARTIES

### A. Plaintiffs

11. Plaintiff Randall I. Miller (sometimes "Randall") is an individual residing at 12408 Highway 1048, Roseland, Louisiana, Tangipahoa Parish. At the time of the Incident he was 58 years old.

12. Plaintiff Brenda D. Miller (sometimes "Brenda") is an individual residing at 12408 Highway 1048, Roseland, Louisiana, Tangipahoa Parish. At the time of the Incident she was 61 years old.

13. The Property is owned by Plaintiffs, and includes twenty-six acres in Roseland, Louisiana. They have lived there for over twenty-five years. The Property sits only 300 yards from the Smitty's Property—well within the one-mile mandatory evacuation zone imposed on August 22, 2025.

### B. Smitty's Defendants

14. Defendant Smitty's Supply, Inc. is a Louisiana corporation with its principal place of business in Louisiana. *See* Exhibit E-9. At all relevant times, Smitty's owned and operated the Facility. Smitty's is a "person" under § 502(5) of the CWA, 33 U.S.C. § 1362(5); § 302(e) of the CAA, 42 U.S.C. § 7602(e); § 1004(15) of RCRA, 42 U.S.C. § 6903(15); and § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

15. Defendant Chad Tate served as President of Smitty's at all relevant times. Plaintiffs sue him in both his individual and official capacities. As President, Tate directed and controlled the Facility's operations. He made decisions on regulatory compliance, environmental management, safety protocols, and hazardous substance storage.

16. Defendant Craig Ellison served as Director of Compliance of Smitty's at all relevant times. Plaintiffs sue him in both his individual and official capacities. Ellison bore direct responsibility for the Facility's compliance with environmental laws, regulations, and permit requirements—including RCRA, the CWA, and the CAA. *See* Exhibit C at 1–3.

17. Defendant Jon Lorio served as Chief Operating Officer of Smitty's at all relevant times. Plaintiffs sue him in both his individual and official capacities. As COO, Lorio directed and controlled the Facility's day-to-day operations. He oversaw hazardous materials handling, waste management, and operational safety. *See* Exhibit C at 1–3.

18. Defendant Edgar R. Smith III is an individual who, at all times relevant to this Complaint, served as Vice President and as a Director of Smitty's Supply, Inc., a position he has held continuously since at least 2001 according to records maintained by the Louisiana Secretary of State. Smith is sued in both his individual capacity and his official capacity as Vice President of Smitty's. In his role as Vice President, Smith had authority over and involvement in the Facility's operations, sales, and corporate affairs, and exercised sufficient control over the storage, handling, and disposal of hazardous substances at the Facility to render him personally liable as an "operator" under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), and, to the extent he directed or authorized the disposal of hazardous substances, as an arranger or generator under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). Smith is further subject to personal liability under Louisiana Civil Code articles 2315 and 2316 for his individual acts and omissions in connection with the Incident. Smith also served, and continues to serve, as a member, manager, or director of one or more of the SACDs named herein, including CAM2 International, L.L.C. and CAM2 Holding Company, L.L.C.

**C. SACDs**

19. Records maintained by the Louisiana Secretary of State, together with U.S. EPA § 104(e) information-request correspondence issued in connection with the Incident, reflect that Smitty's operates as part of a common corporate enterprise with numerous affiliated entities that share Smitty's corporate headquarters address at 63399 Highway 51 North, Roseland, Louisiana; share one or more of Smitty's officers, directors, or members, including Chad Tate and Edgar R. Smith III; and, in several instances, share a registered agent and business telephone numbers with Smitty's. These entities are named as Defendants CAM2 International, L.L.C.; CAM2 Holding Company, L.L.C.; Smith & Tate Holdings, L.L.C.; Smith & Tate Investments, L.L.C.; Latch Oil, Inc.; Warren Chemical Corporation; Additives Plus, L.L.C.; and CMS Chemicals, LLC (collectively, the Successor and Affiliate Corporate Defendants, hereinafter referred to collectively as "SACDs"). *See* Exhibit D, U.S. Env't Prot. Agency, Index of Documents, Smitty's Supply Fire, FOIA No. 2026-EPA-00830, at 28–40 (documenting § 104(e) information-request letters issued to CAM2 International, CAM2 Holding Company, Smith & Tate Holdings, Smith & Tate Investments, Latch Oil, Warren Chemical Corporation, Additives Plus, and CMS Chemicals).[2]

20. Collectively these entities make up the SACDs. The SACDs were formed in part, and are now operated as a part of Smitty's attempt to evade its responsibility and liability for the Incident. The SACDs are the alter egos of Smitty's and their corporate/entity veils should be pierced in order to allow recovery of any damages for which Smitty's is liable from them.

[2] For avoidance of doubt, wherever this Complaint alleges conduct, omissions, ownership, operation, control, custody, violations, liability, damages, or requested relief with respect to "Smitty's," "Smitty's Defendants," or the "Facility," Plaintiffs allege those matters against the Successor and Affiliated Corporate Defendants ("SACDs") to the extent they are liable as successors, mere continuations, alter egos, members of a single business enterprise, owners, operators, custodians, or affiliated entities that assumed, continued, controlled, benefitted from, or were used to evade liabilities arising from Smitty's operations and the Incident, as alleged herein.

21. CAM2 International, L.L.C. is a Louisiana limited liability company that has, since at least 2016, been a recurring co-debtor with Smitty's on Uniform Commercial Code financing statements secured against assets located at the Facility, and that shares common ownership and management with Smitty's through Defendant Edgar R. Smith III, who serves or has served as a member and an officer of CAM2 International, L.L.C. while simultaneously serving as Vice President of Smitty's. Exhibit E-1 (La. Sec'y of State, Business Registration — CAM2 International, L.L.C.).

22. CAM2 Holding Company, L.L.C. is an affiliated holding entity within the same corporate enterprise, sharing Smitty's corporate address and common membership with Defendant Edgar R. Smith III and Defendant Chad Tate. Exhibit E-2 (La. Sec'y of State, Business Registration — CAM2 Holding Company, L.L.C.).

23. Smith & Tate Holdings, L.L.C. and Smith & Tate Investments, L.L.C. are Louisiana limited liability companies bearing the surnames of, and sharing the corporate address and common ownership of, Defendants Edgar R. Smith III and Chad Tate. Exhibit E-3 (La. Sec'y of State, Business Registration — Smith & Tate Holdings, L.L.C.); Exhibit E-4 (La. Sec'y of State, Business Registration — Smith & Tate Investments, L.L.C.).

24. Latch Oil, Inc., Warren Chemical Corporation, Additives Plus, L.L.C., and CMS Chemicals, LLC are each affiliated entities that share one or more corporate officers, directors, registered agents, or business addresses with Smitty's, and each received a U.S. EPA § 104(e) information request in connection with the Incident, reflecting U.S. EPA's own determination that these entities may possess information relevant to Smitty's liability for the release of hazardous substances at the Facility. *See* Exhibit D at 28-40; Exhibit E-5 (La. Sec'y of State, Business Registration — Latch Oil, Inc.); Exhibit E-6 (La. Sec'y of State, Business Registration — Warren

Chemical Corporation); Exhibit E-7 (La. Sec'y of State, Business Registration — Additives Plus, L.L.C.); Exhibit E-8 (La. Sec'y of State, Business Registration — CMS Chemicals, LLC).

25. Under CERCLA § 107(a)(1)–(2), 42 U.S.C. § 9607(a)(1)–(2), and applicable federal common law, a corporation that acquires the assets, business, or operations of another corporation, or that operates as a mere continuation, alter ego, or single business enterprise with a CERCLA-liable entity, may itself be held liable as an "owner" or "operator" where (1) the successor expressly or impliedly agrees to assume the predecessor's liabilities, (2) the transaction amounts to a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction was fraudulent or undertaken to escape liability. Under Louisiana law, courts likewise disregard the separate corporate identity of affiliated entities that operate as a single business enterprise, sharing common ownership, management, and undercapitalization designed to defeat creditor recovery.

26. The SACDs' common identity of officers and directors with Smitty's, shared corporate address, shared registered agent, and, in the case of CAM2 International, L.L.C., recurring status as a secured co-debtor on financing statements encumbering Facility assets, support a reasonable inference that the SACDs operate as a single business enterprise with, or are the alter ego of, Smitty's, such that each member of the SACDs is jointly and severally liable, together with Smitty's, as an owner or operator under CERCLA § 107(a)(1)–(2) and under the Louisiana state-law causes of action pleaded herein. In this regard, the SACDs are nothing more than a mere continuator of Smitty's, established in some respects to escape liability. Plaintiffs reserve the right to further amend this Complaint as discovery clarifies the precise corporate relationships among Smitty's and the SACDs and other entities not named herein.

**D. Federal Defendants**

27. Defendant U.S. Environmental Protection Agency is an agency of the United States Government with responsibility for administering and enforcing the SDWA, the CWA, the CAA, CERCLA, and RCRA.

28. Defendant Lee Zeldin is an individual who, at all times relevant to this Complaint, served as Administrator of the U.S. Environmental Protection Agency. Zeldin is sued in both his individual capacity and his official capacity as Administrator of U.S. EPA. In his role as Administrator, Zeldin had the ultimate authority and responsibility for the exercise of U.S. EPA's emergency powers under SDWA § 1431, 42 U.S.C. § 300i, and for ensuring U.S. EPA's compliance with its mandatory duties under SDWA § 1414, 42 U.S.C. § 300g-3.

29. Defendant Scott Mason is an individual who, at all times relevant to this Complaint, served as Regional Administrator of the U.S. Environmental Protection Agency, Region 6. Mason is sued in both his individual capacity and his official capacity as Regional Administrator of U.S. EPA Region 6. In his role as Regional Administrator, Mason had direct supervisory authority and responsibility over U.S. EPA's response to the Incident, including the exercise of emergency powers, the dissemination of public health information, and the oversight of Smitty's regulatory compliance within U.S. EPA Region 6.

**E. State Defendants**

30. Defendant Louisiana Department of Environmental Quality is the state agency responsible for implementing Louisiana's environmental laws and regulations and serves as the primary enforcement agency ("primacy agency") for the SDWA in Louisiana. LDEQ has broad authority and responsibility to protect the public health and environment of Louisiana under the LEQA, La. R.S. 30:2001 *et seq.*

31. Defendant Courtney J. Burdette is an individual who, at all times relevant to this Complaint, served as Secretary of the Louisiana Department of Environmental Quality. Burdette is sued in both her individual capacity and her official capacity as Secretary of LDEQ. In her role as Secretary, Burdette had the ultimate authority and responsibility for LDEQ's enforcement of the SDWA's primacy obligations, the LEQA, and all environmental regulations within Louisiana's jurisdiction, including the duty to protect public health in response to the Incident.

32. Defendant Dr. Amanda Vincent is an individual who, at all times relevant to this Complaint, served as Director of the Office of Environmental Services of the Louisiana Department of Environmental Quality. Dr. Vincent is sued in both her individual capacity and her official capacity as Director of the Office of Environmental Services of LDEQ. In her role as Director, Dr. Vincent had direct supervisory authority and responsibility over LDEQ's environmental monitoring, testing, public notification, and response activities in connection with the Incident.

33. Defendants Burdette and Dr. Vincent are "persons" acting under color of state law within the meaning of 42 U.S.C. § 1983. Claims for prospective injunctive relief against Burdette and Dr. Vincent in their official capacities are authorized under the *Ex parte Young* doctrine, notwithstanding the Eleventh Amendment, because Plaintiffs seek to compel these officials' future compliance with federal law.

## IV. SUPPORTING MATERIALS

### A. Materials Relied on in this Complaint

34. The materials relied upon by Plaintiffs are attached hereto as Attachment 1:

(1) Exhibit A – U.S. Env't Prot. Agency, Pollution/Situation Report No. 1 (POLREP No. 1), Smitty's Supply Fire, Roseland, LA (Aug. 23, 2025);

(2) Exhibit B – The Millers' Notice of Intent to Sue;

(3) Exhibit C – U.S. Env't Prot. Agency, Region 6, RCRA Compliance Evaluation Inspection Report: Smitty's Supply, Inc., Roseland, LA, EPA ID No. LAR000078691 (Dec. 3, 2025);

(4) Exhibit D – U.S. Env't Prot. Agency, Index of Documents, Smitty's Supply Fire, FOIA No. 2026-EPA-00830;

(5) Exhibit E – Louisiana Secretary of State documentation for SACDs (consolidated);

a. Exhibit E-1 – La. Sec'y of State, Business Registration: CAM2 International, L.L.C.

b. Exhibit E-2 – La. Sec'y of State, Business Registration: CAM2 Holding Company, L.L.C.

c. Exhibit E-3 – La. Sec'y of State, Business Registration: Smith & Tate Holdings, L.L.C.

d. Exhibit E-4 – La. Sec'y of State, Business Registration: Smith & Tate Investments, L.L.C.

e. Exhibit E-5 – La. Sec'y of State, Business Registration: Latch Oil, Inc.

f. Exhibit E-6 – La. Sec'y of State, Business Registration: Warren Chemical Corporation

g. Exhibit E-7 – La. Sec'y of State, Business Registration: Additives Plus, L.L.C.

h. Exhibit E-8 – La. Sec'y of State, Business Registration: CMS Chemicals, LLC

i. Exhibit E-9 – La. Sec'y of State, Business Registration: Smitty's Supply, Inc.

(6) Exhibit F – U.S. Env't Prot. Agency, Detailed Facility Report: Smitty's Supply, Inc., ECHO Database;

(7) Exhibit G – U.S. Env't Prot. Agency, Pollution/Situation Report No. 25 (POLREP No. 25), Smitty's Supply Fire, Roseland, LA (Oct. 23, 2025);

(8) Exhibit H – U.S. Env't Prot. Agency, Risk Evaluation for Diethylhexyl Phthalate (DEHP), EPA Doc. No. EPA-740-R-25-062 (Dec. 2025);

(9) Exhibit I – U.S. Env't Prot. Agency, Revision to the Risk Determination for Perchloroethylene (PCE), TSCA (Dec. 14, 2022);

(10) Exhibit J – U.S. Env't Prot. Agency, Region 6, Memorandum Re: Request for a Removal with an Emergency Exemption from the $2 Million Statutory Limitation at Smitty's Supply Fire Emergency Response, Roseland, Tangipahoa Parish, Louisiana (Aug. 27, 2025);

(11) Exhibit K – U.S. Env't Prot. Agency, La. Dep't of Env't Quality & La. Dep't of Health, Joint Statement Regarding Environmental Safety Following Smitty's Supply Facility Fire (Aug. 27, 2025);

(12) Exhibit L – U.S. Dep't of Labor, Occupational Safety & Health Admin., Inspection Detail, Inspection No. 1490402.015, Smitty's Supply, Inc. (Aug. 29, 2020);

(13) Exhibit M – U.S. Dep't of Labor, Occupational Safety & Health Admin., Inspection Detail, Inspection No. 1529416.015, Smitty's Supply, Inc. (May 6, 2021);

(14) Exhibit N – Pace Analytical Servs., LLC, Analytical Report, Project No. 10758764, Smitty's Supply, Inc., Roseland, LA (Dec. 22, 2025) (samples collected Dec. 4, 2025);

(15) Exhibit O – Pace Analytical Servs., LLC, Analytical Report, Project No. 10754794, Smitty's Supply, Inc., Roseland, LA (Nov. 19, 2025) (samples collected Oct. 26, 2025);

(16) Exhibit P – Pace Analytical Servs., LLC, Analytical Report, Project No. 10761727, Smitty's Supply, Inc., Roseland, LA (Jan. 21, 2026) (samples collected Jan. 9-11, 2026);

(17) Exhibit Q – Pace Analytical Servs., LLC, Analytical Report, Project No. 10763144, Smitty's Supply, Inc., Roseland, LA (Feb. 20, 2026) (samples collected Jan. 24–25, 2026);

(18) Exhibit R – Pace Analytical Servs., LLC, Analytical Report, Project No. 20364928, Smitty's Supply, Inc., Roseland, LA (Aug. 25, 2025) (samples collected Aug. 23, 2025);

(19) Exhibit S – ALS Grp. USA, Corp., Environmental Testing Report for Roseland Louisiana Site: Scott Smith Testing Sites (Nov. 20, 2025); and

(20) Exhibit T – La. Dep't of Env't Quality, EDMS Documents (consolidated)

a. Exhibit T-1 – La. Dep't of Env't Quality, EDMS Doc. ID 14945634

b. Exhibit T-2 – La. Dep't of Env't Quality, EDMS Doc. ID 14962728

c. Exhibit T-3 – La. Dep't of Env't Quality, EDMS Doc. ID 14974548

d. Exhibit T-4 – La. Dep't of Env't Quality, EDMS Doc. ID 14990913

## V. FACTUAL BACKGROUND

### A. Smitty's Facility

35. Smitty's owns and operated a nearly forty-acre complex at 63399 U.S. Highway 51 at the intersection of Louisiana Highway 10, north of Roseland, Tangipahoa Parish, Louisiana. Exhibit C at 1–2. Certain of the SACDs currently operate a successor in interest entity on the Smitty's site.

36. Smitty's manufactured and blended petroleum products, lubricating oil, grease, and various chemicals containing hazardous substances at the Facility. It stored, sold, and distributed these products. *See generally*, Exhibit C at 1-18.

37. Smitty's also operated an onsite blow molding plastics manufacturing operation and a pressurized can line for cleaners, starting fluids, and tire inflation products. Exhibit C at 2. The Facility used 24 filling lines and over 250 tanks. *Id.* EPA registered the Facility as a small quantity generator of hazardous waste, a large quantity handler of universal waste, and a used oil transporter under EPA ID LAR000078691. *Id.*

38. Before August 22, 2025, the Facility housed over 250 tanks, plastic totes, and 55-gallon drums on 40 acres. In total, Smitty's housed approximately 11 million gallons of oil-based bulk storage. *See generally*, Exhibit C at 1–18.

39. The Facility discharges wastewater and stormwater through Outfalls 001 through 008 along the Facility and rail spur. Three internal outfalls—102, 105, and 205—convey wastewater into channels that flow into the Tangipahoa River. U.S. Env't Prot. Agency, Detailed Facility Report: Smitty's Supply, Inc., ECHO Database, https://echo.epa.gov (last visited Oct. 2025) [hereinafter "Exhibit F"].

40. The Tangipahoa River runs approximately one-half mile east of the Facility. Exhibit A at 1. It is a perennial, navigable-in-fact waterway. It connects to Lake Pontchartrain, which flows into the Gulf of Mexico.

41. Commercial and residential areas surround the Facility. Exhibit A at 1.

42. Defendants Tate, Ellison, Lorio, and Smith each controlled the Facility's day-to-day operations, regulatory compliance, and safety management. Tate, as President, and Lorio, as COO, directed overall operations. Ellison, as Director of Compliance, ensured environmental regulatory compliance. Each knew—or should have known—of the conditions described herein.

**B. The August 22, 2025 Incident**

43. On August 22, 2025, an explosion and fire erupted at the Smitty's Facility. The fire burned for over two weeks. It was not fully extinguished until September 8, 2025. Exhibit C at 2 (documenting fire continued to burn for over two weeks until fully extinguished on September 8, 2025).

44. The Incident damaged or destroyed Facility equipment and numerous above-ground storage tanks containing oil and hazardous substances. It also damaged warehouses storing additional products and chemicals. Exhibit C at 1-3; *see also* Exhibit A at 1-24.

45. Firefighters applied water and firefighting foam throughout the Facility for over two weeks. This firefighting foam apparently contained PFAS and mixed with oil products and hazardous substances onsite—before being displaced into everyone's bar ditches and tributaries and many people's properties, including the Millers. Exhibit A at 4 (POLREP #2 Site Update). Laboratory testing of controlled discharge samples confirmed the presence of so-called "forever chemicals" PFAS compounds, including perfluorooctane sulfonate (PFOS), perfluorohexane sulfonate (PFHxS), perfluoropentanoic acid (PFPeA), and other PFAS in concentrations ranging

from hundreds to thousands of parts per trillion. *See* Exhibit N at 120 of 189; *see generally* Exhibits O, P, Q, & R.

46. A mixture of oil, firefighting wastewater and foam, hazardous substances, and other pollutants were discharged and released from the Facility. It flowed through stormwater drainage channels and entered the Tangipahoa River. Exhibit A at 1-2 (documenting that firefighting water and facility products flowed offsite via stormwater drainage into the Tangipahoa River).

47. A portion of the discharged materials traveled as far as approximately forty-seven miles downstream toward Lake Pontchartrain. Oil and hazardous substances created a visible sheen on the Tangipahoa River's surface, as well as on ponds and water conveyances throughout Roseland, including the Millers' pond.

48. A large black plume of smoke and soot emanated from the Facility. It drifted into surrounding industrial and residential areas, including the Millers' property and the Tangipahoa River.[3] Residents reported soot and oily droplets up to 20 miles away. Exhibit C at 2. The fire destroyed the Facility's onsite fire station and firetruck. *Id.* at 4.

49. Authorities imposed a one-mile mandatory evacuation zone around the Facility. The zone encompassed approximately 250 homes and 474 residents, including the Millers' property. Exhibit A at 1 (documenting mandatory evacuation within a one-mile radius of the Facility).

50. Responders have collected more than an estimated 2.9 million gallons of materials from the Facility. This includes soils and sediment containing oil and hazardous substances. Exhibit G at 2 (adding up the Facility waste collection numbers in paragraph 2.1.4).

[3] According to the Smith Report, the soot contained, *inter alia*, Dioxin, Dimethyl Phthalate, Chromium, Lead, Molybdenum, and Tetrachloroethane. *See* Exhibit S.

51. Oil and hazardous substances remain at the Facility—on the ground, in the ground, and in tanks, drums, totes, and other containers. Many containers were damaged in the Incident. The Tangipahoa River, the Roseland neighborhoods, and the Millers' pond still contain hazardous substances from the Incident and the response.

52. Testing found PFAS concentrations as high as 13,000 parts per trillion in controlled stormwater discharges at the Facility. *See* Exhibit N at 120 of 189 (reporting PFOS concentration of 13,000 ng/L in controlled discharge sample collected December 4, 2025). That is over 3,000 times higher than the federal SDWA standard.

**C. Smitty's History of Noncompliance**

53. Smitty's has a history of noncompliance, so continuous and repeated its conduct amounts to intent. Exhibit F (documenting Smitty's significant noncompliance status in all twelve quarters of the three-year compliance history preceding the Incident, from April 2022 through August 2025).

54. Between April 2022 and August 2025, Smitty's reported approximately 230 effluent limitation exceedances.[4] Exhibit F (counted from quarterly noncompliance tables). These violations covered, among others, Biochemical Oxygen Demand, Total Organic Carbon, Chemical Oxygen Demand, Total Suspended Solids, pH, oil and grease, and fecal coliform under LPDES Permit LA0127154. *See generally*, Exhibit F.

55. Smitty's remained in significant noncompliance with the CWA for all twelve quarters of the three-year reporting period before the Incident. EPA's Enforcement and Compliance History Online database documented this chronic pattern. *See generally*, Exhibit F. In

[4] That amounts to approximately 5.89 exceedances every month, or approximately 1 every six days.

fact, LDEQ issued multiple incident reports against Smitty's for environmental violations. *See* Exhibit F.

56. On October 7–9, 2025, EPA Region 6 inspectors conducted an announced RCRA Compliance Evaluation Inspection of the Facility areas remaining after the fire. They acted under § 3007 of RCRA, 42 U.S.C. § 6927. Exhibit C at 1–2. Defendants Ellison and Lorio served as the Facility's designated representatives. They participated in the opening and closing conferences. *Id.* at 1–2, 12.

57. Even though the inspection occurred *after* the Incident, when little of Smitty's remained, EPA inspectors documented more than 200 individual spills, at least 250 damaged containers, and more than 300 unlabeled or unidentified containers. Exhibit C at 13. Inspectors could not access many areas of Smitty's due to aisle spacing restrictions and safety concerns. *Id.*

58. In areas unaffected by the fire, EPA inspectors found pervasive evidence of historic and ongoing environmental mismanagement. Exhibit C at 4, 6. Inspectors found unlabeled and undated lead-acid batteries scattered across the property: 11 loose batteries on the ground near the truck shop, 21 on a pallet at the garage bays, and 16 on shelving inside the truck shop. One battery had leaked acid residue onto the floor. *Id.* at 4-8.

59. Outside the Grease Plant, inspectors encountered an estimated 195 containers. Exhibit C at 6. They could not access most of the storage area. A massive grease release—up to three inches thick—covered approximately 100 square feet and blocked all access points. *Id.* Dozens of containers stood open, unsecured, tipped, or damaged. *Id.* Active and historic spills covered the cement pad. Discoloration beyond the pad's boundaries showed past and present releases to the environment. *Id.*

60. In Tank Farm 10, inspectors found 6 to 8 inches of unidentified oily liquid pooled within the secondary containment walls. Cracks in the containment structure were open to seeping. Arrows had been drawn on the wall pointing to one breach. Exhibit C at 6. In Tank Farm 17, inspectors found large cracks in the floors and walls near almost every tank. *Id.* at 10. Two open valves allowed releases to escape to the parking lot—one valve was padlocked in the open position, and a reddish liquid had pooled in the parking lot. *Id.* at 10-11.

61. Inside the Grease Plant, inspectors found caked white, powdery material near openings at the base of the walls. Exhibit C at 6, App. 2, Photo 28. Materials could migrate directly to the outside environment through these openings. *Id.* at 6.

62. Inspectors documented a tote labeled "dodecylbenzenesulfonic acid" with a "corrosive" warning label. Exhibit C at 7. It was actively leaking through a saturated rag stuffed into the spigot. *Id.* This corrosive material sat less than four feet from drums labeled "Navipol" with "flammable" warning placards. *Id.* Elsewhere, inspectors found totes of corrosive monomethylamine leaking onto the ground near a hole in the corrugated metal wall—next to flammable materials. *Id.* at 8. In the outdoor storage area, a container with crystalline residue sat directly beside a container labeled "spontaneously combustible." *Id.* at 12. Drums near the truck shop bore "radioactive" hazard labels. *Id.* at 5, App. 1, Photo 14.

63. In the outdoor container storage area, inspectors counted at least 91 individual spills. Exhibit C at 11. Some escaped the concrete pad via sump or flowed beyond the Facility's southern property line. *Id.* No secondary containment existed to prevent offsite migration. *Id.* Many containers were stacked without aisleways. *Id.* Strong hydrocarbon and solvent smells indicated additional releases. *Id.* at 11–12. At least 100 containers bore labels reading "off spec," "do not use," "bad," "expired," "approved for disposal," or similar designations. Smitty's had

made no waste determinations. *Id.* at 12. In the "Boneyard" north of Warehouse 6, a shallow drainage ditch and gravel puddle contained standing oil. The ground beneath decommissioned trucks was stained from oil leakage—batteries and fluids had never been removed. *Id.* at 13.

64. At the time of the inspection, hazardous substance and materials were still being released into the environment.

65. Smitty's entered settlement agreements with LDEQ in 2022 and again in 2023–2024 to resolve some of its violations. *See* Exhibit F at 1 (documenting $161,522 in penalties imposed against Smitty's). It continued violating its regulatory obligations after each settlement.

**D. Smitty's SPCC Plan Deficiencies**

66. After the Incident, EPA reviewed Smitty's Spill Prevention, Control, and Countermeasure ("SPCC") Plan required by 40 C.F.R. § 112.12 and 40 C.F.R. § 112.7. Exhibit C at 17 (documenting EPA's request for and receipt of Smitty's SPCC Plan during the inspection).

67. EPA found the plan deficient in numerous respects. Smitty's failed to include adequate procedures for discharge response, predicted flow directions, containment discussions, tank inspection procedures, personnel training, and secondary containment details. Exhibit C at 13-17. Defendant Ellison, as Director of Compliance, bore direct responsibility for developing and maintaining the SPCC Plan.

68. Smitty's also failed to submit a Facility Response Plan as required by 40 C.F.R. § 112.20. Exhibit C at 17-18.

**E. Harm to the Millers**

69. Before the Incident, the Millers enjoyed good health. They are in the prime of life. They own horses, hunting dogs, and cats.

70. The Incident rendered the Millers' pastureland, hay, pond, water troughs, and outdoor areas unusable. The air emissions included soot and industrial metals, burnt materials and

petroleum and other vapors, solid and hazardous waste mixed with them. The metals permeated the Millers' farmstead. The residence remains covered in a black soot goo that repeated rainstorms have not removed. The pond still has a darkened sediment reflecting the absorption of hazardous substances from the airborne phase, soot, and surface waters. Chemicals and debris from the explosion contaminated them all.

71. Even today, the Millers smell fumes when downwind from Smitty's. Pollutants from Smitty's remain in the water column, sediment, and on the Millers' property.

72. Before the Incident, the Millers boated, fished, and swam in the Tangipahoa River. They entered at various points through Arcola, Amite, and Ponchatoula. Mr. Miller camped on the river, ran trout lines, netted baitfish, floated and boated the river, and caught fish to stock the pond on Plaintiffs' property. Since the explosion polluted the river with toxic chemicals, the Millers will not use it for any recreational activity. They will not eat fish from it. They fear harmful effects.

73. The Millers have suffered and continue to suffer involuntary exposure to hazardous substances at their property. These include the presence of hazardous substances, heavy metals, toxic chemicals, Phthalates, and PFAS. *See* Exhibit N at 120 of 189 (documenting PFOS at 13,000 ng/L and other PFAS compounds in December 2025 controlled discharge samples); Exhibit P at 75 of 108 (documenting PFOS at 11,200 ng/L in January 2026 controlled discharge samples); Exhibit O at 41 of 139, 45 of 139 (documenting elevated PFAS concentrations in October 2025 controlled discharge samples). Exposure pathways include contaminated drinking water, airborne contaminants, contaminated soil and surface water, and dermal contact.

74. The Millers have experienced acute and chronic health effects attributable to this exposure. These include respiratory distress, skin irritation, headaches, nausea, and symptoms consistent with chemical exposure such as "dementia like" mental confusion and loss of acuity.

They suffer ongoing anxiety and mental anguish about potential long-term health consequences and their future economic health because of the damage. The full extent of their injuries are not yet known.

75. Plaintiffs face risk of chronic and latent health conditions including cancer, neurological impairment, kidney and liver damage, loss of bone density, and impairment of cognitive abilities. Loss of cognitive abilities is a known harm associated with exposure to dimethyl as well as other phthalates, among the chemicals released by Smitty's on the day of the Incident. *See* Exhibits A, C, F, G, J, N, O, P, Q, R, & S (documenting Smitty's hazardous waste generation); Exhibit H at 11 (finding robust evidence that DEHP exposure can cause developmental and reproductive toxicity, including phthalate syndrome); *see also* Exhibit I at 1-5 (finding PCE poses unreasonable risk to human health including neurotoxicity, liver effects, and cancer from inhalation and dermal exposure); *see, e.g., Prohibition of Children's Toys and Child Care Articles Containing Specified Phthalates*, 82 Fed. Reg. 49,938, 49,946–47 (Oct. 27, 2017) (discussing CHAP's review of epidemiological studies associating prenatal or neonatal phthalate exposure with reduced mental and psychomotor development, attention deficits, and behavioral symptoms in children and CHAP's recommendation that "phthalates that induce antiandrogenic effects (DINP, DIDP, DPENP, DHEXP, and DCHP[)] should be permanently banned from use in children's toys and child care articles at levels greater than 0.1 percent." ). To this day, the bar ditches and canals contiguous to the Millers' property or running through it have a black hazardous substance embedded in the soils, even while it is transported by water about the community and to the Tangipahoa River.

76. The Incident contaminated the Millers' twenty-six acres, including pastureland, a pond, and outbuildings. The Millers suffered diminished property value and lost use and enjoyment

of their home. Plaintiffs have suffered loss of access to safe, potable drinking water for cooking, drinking, bathing, hygiene, and other essential domestic purposes, including for their livestock.

77. Both Plaintiffs have suffered severe emotional distress, mental anguish, anxiety, and fear. They fear future cancer, immune system disorders, thyroid disease, and other health consequences linked to PFAS and hazardous chemical exposure. They fear for their animals. They fear for their community. The Millers have each suffered noteworthy cognitive decline since the Incident of a type not normally associated with people the Millers' age.

78. Pursuant to Federal Rule of Civil Procedure 9(g), Plaintiffs specifically state the following items of special damages, which are continuing and not yet fully ascertained: veterinary examination and treatment expenses for Plaintiffs' horses, dogs, and cats; costs of independent environmental testing and sampling of Plaintiffs' soil, water, and pond; costs of temporary relocation and alternative housing incurred and to be incurred during remediation of Plaintiffs' property; and costs of medical monitoring, including baseline health assessments and periodic diagnostic testing.

79. The Millers' mental anguish is compounded by U.S. EPA's October 2025 finding that the residential community where the Millers reside is located directly behind the Smitty's Grease Plant, where inspectors documented releases of chemicals migrating through openings at the base of the building walls to the outside environment, incompatible hazardous materials stored together without adequate separation, grease deposits up to three inches deep blocking access pathways, and cracked containment walls actively seeping oily liquids. Exhibit C at 5–6, App. 2, Photos 24 & 109. The scope of the Facility's pre-existing environmental mismanagement — more than 200 spills, 250 damaged containers, and 300 unlabeled containers documented in just three

days of inspection — confirms that the Millers' fear of ongoing and future contamination exposure is objectively reasonable and well-founded. *Id.* at 13.

**F. U.S. EPA's and the Federal Defendants' Failure to Act**

80. In the immediate aftermath of the Incident, nearby residents including the Millers reported a plethora of impacts such as discoloration, foul odors, and unusual taste in their tap water. Subsequent testing revealed the presence of hazardous substances including heavy metals and PFAS exceeding the maximum contaminant levels ("MCLs") established under the SDWA's National Primary Drinking Water Regulations, 42 U.S.C. § 300g-1, and 40 C.F.R. § 141. *See* Exhibit R at 15 of 39, 19 of 39, 26 of 39 (detecting chromium and lead in water samples collected the day after the explosion).

81. Despite the severity and immediacy of the contamination, Defendants U.S. EPA, Zeldin, and Mason have failed to exercise their authority under the SDWA or any other applicable law in a timely or adequate manner, including their failure to exercise emergency powers under § 1431 of the SDWA, 42 U.S.C. § 300i, which authorizes the Administrator to take such actions as necessary to protect the health of affected persons.

82. Either independently, or in concert with LDEQ, Burdette, Dr. Vincent, and/or Smitty's, Defendants U.S. EPA, Zeldin, and Mason elected to withhold relevant sampling results, status and extent of contamination, and additional important health and safety information from the public while issuing comforting but misleading information which confused and harmed the Millers.

83. Specifically, On August 27, 2025, U.S. EPA submitted an internal request for an emergency exemption from the $2 million statutory limitation, stating that "continued response actions are immediately required . . . to prevent, limit, or mitigate an emergency, and there is an immediate risk to public health." Exhibit J at 1–2, 4–5 (stating "the emergency exemption is

appropriate because continued response actions are immediately required . . . to prevent, limit, or mitigate an emergency, and ***there is an immediate risk to public health***" and finding that ***"[t]he hazardous substances are unsecured in the environment and pose a grave threat to human health***" (emphasis added)). On the same day, U.S. EPA issued a joint public statement with the Louisiana Department of Health and LDEQ stating that, "[b]ased on the data currently available, there is no indication of any imminent threat to public health from the soot or smoke residue deposited in the surrounding area." Exhibit K at 1 (joint press release asserting no imminent threat to public health on the same date EPA internally acknowledged "immediate risk to public health").

84. Far from being an isolated misrepresentation, the Federal Defendants' August 27, 2025 public assertion that "there is no indication of any imminent threat to public health" was republished verbatim — *without revision, correction, or retraction* — in daily EPA and LDEQ Situation Updates issued continuously from September 30, 2025 through at least November 6, 2025. *See* La. Dep't of Env't Quality, EDMS Doc. ID 14945634, available at https://edms.deq.louisiana.gov/app/doc/view?doc=14945634 (daily situation updates from Sept. 30 through Oct. 6, 2025, each containing the identical statement: "Based on the data currently available, there is no indication of any imminent threat to public health from the soot or smoke residue deposited in the surrounding area") [Exhibit T-1]; La. Dep't of Env't Quality, EDMS Doc. ID 14962728, available at https://edms.deq.louisiana.gov/app/doc/view?doc=14962728 (daily situation updates from Oct. 6 through Oct. 14, 2025, contain same statement about "no indication of any imminent threat to public health") [Exhibit T-2]; La. Dep't of Env't Quality, EDMS Doc. ID 14974548, available at https://edms.deq.louisiana.gov/app/doc/view?doc=14974548 (daily situation updates from Oct. 20 through Oct. 28, 2025, contain same statement about "no indication of any imminent threat to public health") [Exhibit T-3]; La. Dep't of Env't Quality, EDMS Doc.

ID 14990913, available at https://edms.deq.louisiana.gov/app/doc/view?doc=14990913 (daily situation updates from Oct. 29 through Nov. 6, 2025, contain same statement about "no indication of any imminent threat to public health") [Exhibit T-4].

85. These daily updates were distributed to the public through EPA community "office hours" held at public libraries, Dollar General stores, and community venues throughout Tangipahoa Parish, and through coordinated public information channels. *See, e.g.*, Exhibit T-2 at 1, 5, 9 (documenting EPA community outreach events at which the "no indication of any imminent threat to public health" language was disseminated to residents, including interactions with 250 residents at the Ponchatoula Public Library and Dollar General on October 6, 2025).

86. The Federal Defendants repeated this reassurance on each of these days despite the fact that, contemporaneously: (a) EPA's own October 7–9, 2025 RCRA Compliance Evaluation Inspection had identified twenty-six (26) specific areas of regulatory concern at the Facility, Exhibit C at 13–17; (b) LDEQ documented an unauthorized discharge to Pond 2 on October 26, 2025, Exhibit T-3 at 38; and (c) LDEQ's own stormwater sampling from controlled discharges at the Facility revealed PFAS concentrations as high as 13,000 parts per trillion — more than 3,000 times the federal Safe Drinking Water Act maximum contaminant level, *see* Exhibit N at 120 of 189. The "*no indication of any imminent threat*" language was never revised, supplemented, or qualified to account for this accumulating evidence of ongoing contamination and regulatory noncompliance.

87. Defendants U.S. EPA, Zeldin, and Mason have failed to ensure adequate public notice of and response to the contamination and health risks as required under SDWA § 1414(c), 42 U.S.C. § 300g-3(c), including the requirement under 42 U.S.C. § 300g-3(c)(2)(C) that when a

violation has the potential to have serious adverse effects on human health, notice must be distributed within twenty-four hours.

88. Defendants U.S. EPA, Zeldin, and Mason have failed to act in compliance with the SDWA's mandatory duties under § 1414(a)(1)(B), 42 U.S.C. § 300g-3(a)(1)(B), which requires U.S. EPA to "issue an order" or "commence a civil action" when, beyond thirty days after notification, the state has not commenced appropriate enforcement action. As the court held in *In re Flint Water Cases*, No. 16-cv-10444, 2026 WL 151106, at *24 (E.D. Mich. Jan. 20, 2026), once U.S. EPA makes a finding of noncompliance, its '"conduct cannot appropriately be the product of judgment or choice' because the SDWA 'specifically prescribes a course of action for [U.S. EPA] to follow."'

**G. LDEQ's and the State Defendants' Failure to Act**

89. As the primacy State agency under the SDWA, LDEQ is responsible for ensuring public water systems in Louisiana comply with all applicable requirements, including maximum contaminant levels, monitoring and testing protocols, and public notification requirements. As the court recognized in *Mich. Dep't of Env't Quality v. City of Flint*, 282 F. Supp. 3d 1002, 1012–13 (E.D. Mich. 2017), state drinking water regulations enacted pursuant to the SDWA's cooperative federalism framework constitute federal requirements enforceable in federal court. Defendants Burdette and Dr. Vincent, as the senior officials responsible for LDEQ's environmental enforcement and monitoring functions, personally directed or failed to direct LDEQ's response to the Incident.

90. Defendants LDEQ, Burdette, and Dr. Vincent have failed to ensure adequate public notice of the contamination, to require comprehensive testing and monitoring, to mandate provision of alternative water supplies, and to oversee remediation of contamination.

91. Defendants LDEQ, Burdette, and Dr. Vincent, along with Defendants U.S. EPA, Zeldin, and Mason, had and have information indicating levels of toxins and other contaminants were above safe levels, and yet falsely and misleadingly assured the Millers and other members of the public that such levels were safe. By so doing, these Defendants infringed on the Millers' rights to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent.

## VI. CLAIMS AGAINST THE SMITTY'S DEFENDANTS

### A. FIRST CAUSE OF ACTION
### Violation of CAA
### Citizen Suit Under 42 U.S.C. § 7604

92. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

93. The CAA is designed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).

94. Louisiana has an approved State Implementation Plan ("SIP") under the CAA. 42 U.S.C. § 7410. Once approved by U.S. EPA, SIPs become federal law and are enforceable under the CAA. *See* 42 U.S.C. §§ 7413, 7604; 40 C.F.R. § 52.23.

95. As a result of the Incident, and thereafter, Smitty's caused unpermitted emissions of air pollutants, including volatile organic compounds, particulate matter, and hazardous air pollutants to be emitted into the air and on to the Property, in violation of the CAA and Louisiana's SIP. The effects of those emissions persist because open containers and bar ditches throughout Roseland continue to contain observable amounts of wastes that continue to emit into the air, and the Millers continue to smell emissions when they are downwind.

96. Neither U.S. EPA nor LDEQ has commenced and is diligently prosecuting a civil action against Smitty's for CAA violations. 42 U.S.C. § 7604(b)(1)(B).

97. Pursuant to the CAA's Citizen Suit provision, 42 U.S.C. § 7604(a), Smitty's is liable for injunctive relief and civil penalties for its violations of the CAA and Louisiana's SIP.

**B. SECOND CAUSE OF ACTION**
**CERCLA Cost Recovery and Contribution Under**
**42 U.S.C. §§ 9607(a), 9613(f)**

98. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

99. CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a), provides: "(1) the owner and operator of … a facility, [or] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of … shall be liable for … any … necessary costs of response incurred by any other person consistent with the national contingency plan …."

100. Under CERCLA, "owner or operator means … in the case of an onshore facility …, any person owning or operating such facility …." 42 U.S.C. § 9601(20)(A)(ii).

101. A "facility" is: "(A) any building, structure, installation, equipment, pipe or pipeline … storage container …. or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located …." 42 U.S.C. § 9601(9).

102. A "hazardous substance" includes any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412] . . . ." 42 U.S.C. § 9601(14)(E).

103. A "hazardous substance" also includes "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] . . . ."

104. The Solid Waste Disposal Act is commonly referred to as the Resource Conservation and Recovery Act ("RCRA"), and under RCRA, the Administrator of the United States Environmental Protection Agency has promulgated a list of hazardous waste found at 40 C.F.R. §§ 261.31 and 261.33. The Administrator moreover has identified certain characteristics

of hazardous waste at 40 C.F.R. §§ 261.20-261.23, which include the characteristic of "ignitability."

105. Under these definitions, and at all times relevant hereto, Smitty's, through its officers and agents Tate, Ellison, Lorio, and Smith, owned and operated the Roseland Facility, including the storage, handling, disposal, and transport of hazardous substances that were released during the Incident.

106. Smitty's is strictly liable under CERCLA § 107(a)(1)–(2), 42 U.S.C. § 9607(a)(1)–(2), as the owner and operator of a facility from which hazardous substances were released into the environment. *See United States v. Bestfoods*, 524 U.S. 51, 65-66 (1998). Along with Smitty's, Defendants Tate, Lorio, Ellison, and Smith are also liable as "operators" under CERCLA to the extent they individually directed the workings of, managed, or conducted the affairs of the Facility in a manner that resulted in the disposal of hazardous substances. *See id.* at 66–67.

107. "Disposal" is defined under CERCLA to include "the discharge, deposit, … dumping, … or placing of any [hazardous substance] into or on any land or water so that such [hazardous substance] … or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29) (incorporating 42 U.S.C. § 6903(3)). Smitty's discharged, deposited, dumped, and placed hazardous substances during the Incident onto the Millers' property, and elsewhere within this definition.

108. The Millers' property is part of Smitty's CERCLA "Facility," which is broadly defined to include any site or area where hazardous substances have been deposited, stored, or come to be located, and which is not restricted by property boundaries but defined by the horizontal and vertical extent of contamination.

109. The Smitty's Defendants are strictly liable for all necessary costs of response incurred by Plaintiffs consistent with the National Contingency Plan, 40 C.F.R. § 300.1 et seq., including but not limited to costs for environmental testing, alternative water supplies, and remediation. CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

110. The response costs Plaintiffs have incurred and will incur, including costs of independent environmental testing, sampling, alternative water supplies, temporary relocation, and remediation of their property, are necessary costs of response consistent with the National Contingency Plan, 40 C.F.R. § 300.1 et seq., within the meaning of CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), because such costs are directed at identifying, assessing, and addressing the release of hazardous substances on Plaintiffs' property and elsewhere in a manner consistent with the National Contingency Plan's substantive and procedural requirements. For example, Smitty's has not yet defined the horizontal and vertical contamination so required by 40 C.F.R. 300.430. As a part of the Remedial Investigation Feasibility Study ("RIFS"), the extent of contamination must be fully delineated in all soil, groundwater, surface water, and sediment. *Id.*

111. Plaintiffs are also entitled to contribution from the Smitty's Defendants under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).

112. Plaintiffs are also entitled to a mandatory prospective injunction requiring Defendants to respond to and remedy the contamination on Plaintiffs' property.

113. Plaintiffs seek a declaratory judgment pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), declaring the Smitty's Defendants liable for past, present, and future response costs that will be incurred in connection with ongoing remediation of the Millers' property.

114. The Smitty's Defendants are additionally liable under CERCLA for damages to natural resources, including Plaintiffs' property, and for health assessment costs. 42 U.S.C. § 9607(a)(4)(C).

115. The contamination at and emanating from the Facility resulted from the release, commingling, and migration of numerous hazardous substances stored, handled, and disposed of by Smitty's over a period of years, such that the resulting harm to Plaintiffs' property is a single, indivisible harm not capable of reasonable apportionment among any discrete causes. Smitty's and the individual Smitty's Defendants are therefore jointly and severally liable for all response costs, damages, and other relief sought herein, and bear the burden of proving any reasonable basis for divisibility of the harm, a burden they cannot meet given the commingled nature of the hazardous substances released during the Incident and thereafter. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–15 (2009) (recognizing that CERCLA defendants bear the burden of proving a reasonable basis for apportionment of harm, and that joint and several liability applies absent such proof); *see also In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 895–96, 902–04 (5th Cir. 1993) (concluding CERCLA defendants bear the burden of proving a reasonable basis for divisibility of harm, and that joint and several liability applies where defendants cannot meet that burden). The Smitty's Defendants, including the SACDs, are jointly and severally liable for the response costs, damages, and other relief sought under this Cause of Action. Each member of the SACDs is liable as an owner or operator under CERCLA § 107(a)(1)–(2), 42 U.S.C. § 9607(a)(1)–(2), for the reasons set forth above.

116. In the alternative, Plaintiffs seek relocation to a comparable property with similar improvements and amenities. Under CERCLA at 42 USC § 4601 et seq.

## C. THIRD CAUSE OF ACTION
## RCRA Imminent and Substantial Endangerment

**42 U.S.C. § 6972(a)(1)(B)**

117. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

118. An imminent and substantial endangerment to health and the environment, within the meaning of § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), exists and continues to exist due to the release into the environment of solid and hazardous waste from Smitty's Facility.

119. Section 6972(a)(1)(B) provides a person such as the Millers can:

> commence a civil action … against any person, including the United States . . . and including any past or present generator, past or present transporter, or past or present owner or operator . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

120. The district court jurisdiction extends, without regard to the amount in controversy or the citizenship of the parties, to enforce the permanent, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A) to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under Section 6928(a)-(g) of this title. Visible contamination still exists throughout Roseland. Any response to date has been Smitty-centric. No RCRA or CERCLA investigations have been performed such as formal remedial investigation/Feasibility Study has

been performed. No defendant has ever approached the Miller to discuss investigation of the Millers Property or compensation to them.[5]

121. RCRA defines "disposal" to include "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

122. The resulting contamination presents an imminent, ongoing, and substantial endangerment to health and the environment because contaminated soil, surface water, and groundwater at, under, and surrounding Smitty's continues to harm the environment and the Millers and their property.

123. As Exhibits N, O, P, and Q reflect, much of the town of Roseland remains contaminated by Smitty's solid waste – and in some locations likely hazardous waste. What's more, in several instances no action has been taken to remediate areas such as the controlled discharge points and occupied properties with residences such as the Millers. *See* Exhibits N–Q (documenting elevated PFAS concentrations and other hazardous substances in controlled stormwater discharges from the Facility from October 2025 through January 2026). Remaining, widely dispersed contaminants exist across Roseland and continue to volatize into the air, remain in soils, and migrate into waters. Smitty's, through the actions and omissions of Defendants Tate, Lorio, Ellison, and Smith, has engaged in and contributed to the handling, storage, and disposal of solid and hazardous wastes. In addition to the characteristics and persistence of the chemicals

[5] With one exception, no Defendant has ever contacted the Millers. In September 2025, an individual contacted the Millers and offered either to power wash the exterior of their structures or to provide the cash equivalent so they could hire their own power washer—an approach that would transfer the pollutants from the structures to the Millers' soils and pond.

released, the size of the geographic area impacted by the Incident, warrants treatment of conditions in Roseland as an imminent and substantial endangerment to health and the environment.

124. U.S. EPA's October 7–9, 2025 RCRA Compliance Evaluation Inspection identified 26 specific areas of regulatory concern at the Facility. Exhibit C at 13–17. Among other RCRA violations, Smitty's failed to make hazardous waste determinations on container contents and released materials as required by 40 C.F.R. § 262.11. *Id.* at 13. Smitty's failed to accurately determine its generator category as required by 40 C.F.R. § 262.13. *Id.* Smitty's held hazardous waste for more than 180 days and in quantities exceeding the 6,000-kilogram limit applicable to small quantity generators, in violation of 40 C.F.R. § 262.16(b) and (b)(1). *Id.*

125. Smitty's failed to address damaged containers in violation of 40 C.F.R. § 264.171; failed to keep containers closed during storage in violation of 40 C.F.R. § 264.173(a); failed to store containers in a manner that would not cause ruptures or leaks in violation of 40 C.F.R. § 264.173(b); failed to conduct adequate weekly inspections to detect leaks in violation of 40 C.F.R. § 264.174; failed to adequately separate incompatible wastes in violation of 40 C.F.R. § 264.177(c); and failed to implement its contingency plan for release management in violation of 40 C.F.R. § 264.51(b). *See* Exhibit C at 14.

126. Smitty's failed to properly manage universal waste batteries, including failing to contain leaking batteries in violation of 40 C.F.R. § 273.33(a)(1); failing to determine whether released materials from universal waste constituted hazardous waste in violation of 40 C.F.R. § 273.37(b); failing to label universal waste batteries in violation of 40 C.F.R. § 273.34(a); failing to contain universal waste lamps in structurally sound containers in violation of 40 C.F.R. § 273.33(d)(1); failing to clean up and contain broken lamps in violation of 40 C.F.R. § 273.33(d)(2); failing to label universal waste lamps in violation of 40 C.F.R. § 273.34(e);

accumulating universal waste for longer than one year in violation of 40 C.F.R. § 273.35(a); failing to demonstrate the length of time universal waste had been accumulated in violation of 40 C.F.R. § 273.35(c); and failing to immediately contain releases of universal waste in violation of 40 C.F.R. § 273.37(a). *See* Exhibit C at 14–16.

127. Smitty's failed to comply with used oil management standards, including failing to notify as a used oil transfer facility in violation of 40 C.F.R. § 279.42(b); failing to label used oil containers with the words "Used Oil" in violation of 40 C.F.R. § 279.22(c)(1); failing to respond to used oil releases by stopping the release, containing the released oil, and properly cleaning up and managing the released materials, in violation of 40 C.F.R. § 279.22(d); and failing to determine whether used oil contained total halogens above 1,000 ppm to rebut the hazardous waste presumption, in violation of 40 C.F.R. § 279.44(a)–(b). *See* Exhibit C at 16–17. In addition, Smitty's engaged in speculative accumulation of materials without tracking accumulation dates or meeting the 75% annual turnover requirement, in violation of 40 C.F.R. § 261.1(c)(8). *Id.* at 15. Smitty's also failed to document that stored materials claimed not to be solid waste met the terms of exclusion or exemption, in violation of 40 C.F.R. § 261.2(f). *Id.* at 15–16.

128. Defendant Ellison, as Director of Compliance, was directly responsible for ensuring the Facility's compliance with each of the RCRA requirements identified in the preceding paragraphs. Defendant Lorio, as Chief Operating Officer, directed the day-to-day operations that gave rise to the violations. Defendant Tate, as President, had ultimate authority over and knowledge of the conditions at the Facility. Each individual Smitty's Defendant contributed to the imminent and substantial endangerment described herein.

129. In connection with its RCRA claims, the Millers seek mandatory prospective injunctive relief requiring Smitty's and the SACDs to investigate and remediate the Millers'

Property, restraining injunctive relief preventing Smitty's and the SACDs from causing additional damage to the Millers, appropriate civil penalties, and costs of court including reasonable attorney fees pursuant to RCRA.

## D. FOURTH CAUSE OF ACTION
## Violation of the Safe Drinking Water Act
## 42 U.S.C. § 300f *et seq.*

130. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

131. Under 42 U.S.C. § 300f *et seq.*, when the release of contaminants from a facility is into or threatens a public water system, the SDWA and its regulations are violated.

132. The City of Roseland operates a public water system for human consumption and serves 25 or more customers.

133. The Millers receive their drinking water from the City of Roseland through its public water system.

134. The Incident caused by Smitty's damaged and contaminated the Roseland Public Water System.

135. As recognized in *Concerned Pastors for Social Action v. Khouri*, 194 F. Supp.3d 589, 605–06 (E.D. Mich. 2016), a party that has "significant operational control" over conditions that affect a public water system may be held liable as an "operator" under the SDWA.

136. Smitty's and its employees had and exercised significant operational control over the Roseland Public Water System when it committed the conduct giving rise to the Incident.

137. The releases set forth herein caused by Smitty's discharging into and threatening a drinking water supply render the Smitty's Defendants liable under the SDWA.

138. The Millers seek to have Smitty's restrained and enjoined from further release and discharges of contaminants in a way that adversely affects Roseland's Public Water System and the Millers' drinking water supply.

### E. FIFTH CAUSE OF ACTION
### Violation of LEQA
### La. R.S. 30:2014, 30:2025, 30:2076

139. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

140. Pursuant to RCRA, Plaintiffs seek pursuant to Section 6972(a)(2) to restrain Smitty's from any additional discharges or disposal of solid or hazardous waste and, also under Section (a)(2) "to take such other action as may be necessary," in the form of a mandatory prospective injunction requiring Smitty's to remediate those areas that make up the Facility under CERCLA including all locations where because of Smitty's conduct and fault in the Incident solid or hazardous waste remains in the environment uncontrolled and available, including the Property.

141. The same operational conduct giving rise to the Smitty's Defendants' liability under federal laws as set forth above also violates Louisiana state law. The LEQA prohibits various discharges and releases of pollutants into the environment.

142. The Smitty's Defendants are liable under the LEQA for: (1) unauthorized discharge of pollutants in violation of La. R.S. 30:2014; (2) failure to abide by hazardous waste regulations during operations in violation of La. R.S. 30:2025; and (3) failure to satisfy water quality standards in violation of La. R.S. 30:2076.

143. Pursuant to La. R.S. 30:2025(E), the Smitty's Defendants are liable for civil penalties of not more than $32,500 for each day of violation, and if it is established that any violation was intentional, willful, or knowing, or resulted in a discharge that caused irreparable or severe damage to the environment or endangered human life or health, an additional penalty of not more than $1,000,000.

144. The Millers also seek injunctive relief and restitution from Smitty's and the SACDs.

### F. SIXTH CAUSE OF ACTION
### Louisiana Civil Code Article 667
### Strict Liability for Ultra-Hazardous Activity

145. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

146. Louisiana Civil Code Article 667 makes the Smitty's Defendants strictly liable for damages caused by the ultra-hazardous activity of generating, handling, storing, and disposing of hazardous substances in the manner in which they did at the Facility. La. Civ. Code art. 667.

147. By engaging in the storage and handling of more than 11 million gallons of petroleum products and hazardous chemicals across a nearly forty-acre complex in an area near residential properties — including storing corrosive, flammable, and spontaneously combustible materials in immediate proximity to one another, maintaining cracked secondary containment structures that actively leaked hazardous liquids, and operating a pressurized aerosol can line using flammable propellants — the Smitty's Defendants engaged in activities that, by their nature, create a risk of harm to others even when conducted with the utmost care. Exhibit C at 1–2, 6, 8, 10, 12.

148. Smitty's historical and constant violations of RCRA and other environmental laws is prima facie evidence the Smitty's Defendants acted with much less than the utmost care; rather, and in doing so, failed to act with even ordinary care.

149. As a direct and proximate result of the Smitty's Defendants' ultra-hazardous activity, Plaintiffs have suffered property damage, personal injury, loss of use and enjoyment of their property, emotional distress, and mental anguish.

150. Plaintiffs are entitled to all damages available under Louisiana law, including damages for mental anguish, as a result of the Smitty's Defendants' strict liability.

### G. SEVENTH CAUSE OF ACTION
### Louisiana Civil Code Article 669
### Nuisance

151. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

152. Louisiana Civil Code Article 669 provides that a proprietor may not make his property the source of smoke, soot, nauseous smells, or other airborne contaminants that damage neighboring properties. La. Civ. Code art. 669.

153. The Smitty's Defendants' operations have caused smoke, soot, nauseous smells, and other airborne contaminants to emit from Smitty's property onto the Millers' property, damaging the Millers.

154. The results of the nuisance caused by Smitty's remain in the form of contaminants emitted, discharged and disposed of by Smitty's as a part of the Incident to damage the Millers and their property, and continued noxious odors periodically still coming from Smitty's.

155. The Smitty's Defendants have unreasonably interfered with the rights of neighboring property owners and residents, including the Millers.

156. Plaintiffs are entitled to compensatory damages including damages for mental anguish, loss of use and enjoyment, diminution in property value, discomfort and annoyance, and all other damages cognizable under Louisiana law.

### H. EIGHTH CAUSE OF ACTION
### Louisiana Civil Code Articles 2315 and 2316
### Negligence and Intentional Conduct

157. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

158. Louisiana Civil Code Articles 2315 and 2316 impose liability for negligent and/or intentional conduct that causes damage to another. La. Civ. Code arts. 2315, 2316.

159. The Smitty's Defendants, including Defendants Tate, Ellison, Lorio, and Smith in their individual capacities, were negligent in the use, storage and handling of hazardous materials, failure to maintain adequate safety and containment protocols and measures, failure to prevent the release of hazardous substances into the environment, and failure to warn the surrounding community of the risks posed by the Facility's operations.

160. The Smitty's Defendants' past history of operational violations over a period of years, culminating in the catastrophic explosion, demonstrates a pattern of willful, wanton, and reckless disregard for the safety of neighboring residents and the environment.

161. Moreover, the Smitty's Defendants at all times knew the outcome of their lax compliance could result in a catastrophic event. As described above, the particular failures of Smitty's in compliance included unattended conditions that were potentially flammable and explosive, which constitutes, in the alternative to negligence, intentional conduct.

162. As a direct and proximate result of the Smitty's Defendants' negligence and/or intentional conduct, Plaintiffs have suffered personal injuries, property damage, emotional distress, mental anguish, and all other damages set forth herein.

163. **<u>Severity of Conduct</u>: Wanton and Reckless Disregard for the Rights and Safety of Others.**

164. The wanton and reckless character of the Smitty's Defendants' conduct is directly relevant to, and supports the upper end of, the compensatory general damages range — including damages for mental anguish — available to Plaintiffs under Louisiana Civil Code articles 2315 and 2316. Louisiana courts consistently weigh the severity of a defendant's conduct, including conduct rising to gross negligence or a wanton and reckless disregard for the safety of others, in assessing the reasonableness of a general-damages award, even absent an independent punitive-damages remedy. *See, e.g.*, *Billiot v. B.P. Oil Co.*, 645 So. 2d 604, 613 (La. 1994) (defining wanton or reckless conduct as highly unreasonable conduct involving an extreme departure from ordinary care); *In re New Orleans Train Car Leakage Fire Litig.*, 795 So. 2d 364, 374–76 (La. App. 4th Cir. 2001) (affirming that the degree of culpability and the severity of the defendant's conduct bear on the assessment of damages). The conduct of the Smitty's Defendants, including Defendants

Tate, Ellison, Lorio, and Smith in their individual capacities, was wanton, reckless, and in conscious disregard of the rights and safety of others. The Smitty's Defendants knew of the dangerous conditions at the Facility, had been cited and fined on multiple occasions for environmental violations — including the 230 LPDES effluent limitation exceedances and twelve consecutive quarters of significant CWA noncompliance described above — and yet continued to operate in callous disregard of regulatory requirements, creating the conditions that led to the catastrophic Incident.

165. The Smitty's Defendants' wanton and reckless disregard extended beyond environmental violations to the area of safety as further evidenced by the following documented incidents and conditions: **First**, on August 28, 2020, a Smitty's employee was struck and killed by a semi-truck while performing welding work on a dock plate. U.S. Dep't of Labor, Occupational Safety & Health Admin., Inspection Detail, Inspection No. 1490402.015, Smitty's Supply, Inc. (Aug. 29, 2020) (documenting that at 1:30 p.m. on August 28, 2020, an employee performing welding work on a dock plate was struck and killed when a semi tractor trailer backed into the dock); *see* Exhibit L. **Second**, less than a year later, on May 3, 2021, an employee suffered second- and third-degree burns and a dislocated shoulder from hot grease sprayed during a production-line purging operation. U.S. Dep't of Labor, Occupational Safety & Health Admin., Inspection Detail, Inspection No. 1529416.015, Smitty's Supply, Inc. (May 6, 2021) (documenting that at 7:15 a.m. on May 3, 2021, an employee purging a production line was sprayed with hot grease, sustaining second and third degree burns and a dislocated shoulder); *see* Exhibit M. Both incidents gave Smitty's and its officers direct, contemporaneous knowledge of the dangers posed by inadequate safety and containment practices at the Facility, yet Smitty's continued to operate without remedying the underlying deficiencies. Exhibit C at 3 (documenting the fire destroyed the

Facility's onsite fire station and firetruck, reflecting the inadequacy of Smitty's safety infrastructure).

166. **Third**, EPA's October 2025 RCRA inspection confirmed, <u>even in the areas of the Facility unaffected by the fire</u>, the Smitty's Defendants operations resulted in: (a) more than 200 individual spills; (b) at least 250 damaged containers; (c) more than 300 unlabeled or unidentified containers; (d) incompatible hazardous materials — including corrosives and flammables — stored in immediate proximity to one another; (e) secondary containment structures that were cracked and leaking without repair; (f) containment valves that were padlocked in the open position, allowing hazardous liquids to flow freely off the Facility; and (g) releases that migrated off Facility property and beyond the southern property line without any form of secondary containment — all while a residential community was located directly behind the Grease Plant. *See* Exhibit C at 4, 6, 10–12, App. 2, Photo 28. This systemic, longstanding, and knowing pattern of environmental lawlessness demonstrates the explosion was not a random event, but the foreseeable culmination of the Smitty's Defendants' willful refusal to comply with the regulatory requirements designed to protect public health and the environment from events such as the Incident.

167. The Smitty's Defendants' wanton and reckless disregard for safety did not end with the Incident: continuing post-Incident stormwater discharges from the Facility have confirmed PFAS concentrations as high as 13,000 parts per trillion — over 3,000 times higher than the federal SDWA standard — *see* Exhibit N (Pace Analytical Report dated December 22, 2025, documenting PFOS concentration of 13,000 ng/L in controlled discharge sample collected December 4, 2025); Exhibit O (Pace Analytical Report dated November 19, 2025, documenting elevated PFAS concentrations in controlled discharge samples collected October 26, 2025); Exhibit P (Pace Analytical Report dated January 21, 2026, documenting continued PFAS contamination in samples

collected January 9, 2026); Exhibit Q (Pace Analytical Report dated February 20, 2026, documenting ongoing PFAS presence in samples collected January 24–25, 2026) — and hazardous substances discharged during the Incident and the ongoing response remain present in the Tangipahoa River throughout the Roseland community, and in the Millers' own pond. This ongoing conduct confirms the Smitty's Defendants' wanton and reckless disregard for the rights and safety of others is not confined to the events of August 22, 2025, but is a continuing course of conduct engaged in for years bearing on the full severity and duration of Plaintiffs' damages.

## I. NINTH CAUSE OF ACTION
## 42 U.S.C. § 1983
## Violation of Right to Bodily Integrity and Substantive Due Process

168. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

169. To the extent it is proven that Smitty's and Defendants Tate, Ellison, Lorio, and Smith acted in concert with or under color of state law, either leading to and/or causing the Incident, or in conjunction with the response performed by the Federal Defendants and the State Defendants, Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of their Fourteenth Amendment rights to bodily integrity and substantive due process. U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983.

170. In *Guertin v. Michigan*, 912 F.3d 907, 926–29 (6th Cir. 2019), the Sixth Circuit held exposure of residents to life-threatening contaminants in their drinking water, particularly when accompanied by concealment or misleading assurances of safety, constitutes conscience-shocking conduct that violates clearly established constitutional rights. *See also In re Flint Water Cases*, 960 F.3d 303, 323–24 (6th Cir. 2020); *Boler v. Earley*, 865 F.3d 391, 413 (6th Cir. 2017).

171. Should it be demonstrated that any of the Smitty's Defendants, along with the Federal Defendants and the State Defendants, conspired to conceal the extent, level, or nature of

the contamination arising from the Incident, or concealed such conditions by and while making misleading assurances concerning the actual concentrations of hazardous substances and their health dangers and impacts, such conspiracy violated the Millers' constitutional rights.

172. The coordinated nature of the concealment is evidenced by the fact that on the same day, August 27, 2025, federal and state agencies issued a public statement assuring residents that "there is no indication of any imminent threat to public health from the soot or smoke residue deposited in the surrounding area," Exhibit K, at 1, while EPA Region 6 internally approved an emergency exemption request explicitly acknowledging that "there is an immediate risk to public health" and that the site "will continue to present an imminent and substantial endangerment to public health or welfare or the environment," Exhibit J, at 1, 4. As the court held in *Williams v. City of Jackson*, 663 F. Supp.3d 624, 642 (S.D. Miss. 2023), "without accurate information about the severity of the water crisis, the Plaintiffs could not weigh the risks or make an informed choice about their water consumption. In a very real way, the Defendants' actions stripped the Plaintiffs of the ability to decide for themselves how they would protect their health."

173. Were it not for this concealment, along with the false reassuring statements the Millers received from Smitty's and the Government, the Millers would have had accurate information regarding health risks and they would have had the ability to evaluate the health dangers of staying. As it was, they didn't have the benefit of true and accurate health risks, elected to stay, and now suffer from a myriad of health conditions caused by the Smitty's Defendants.

174. Plaintiffs are entitled to compensatory damages, including damages for mental anguish, and punitive damages against Defendants Tate, Ellison, Lorio, and Smith in their individual capacities for the willful, wanton, and conscience-shocking violation of Plaintiffs' constitutional rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages available

"under § 1983 when defendant's conduct is shown to be motivated by evil motive or intent," or "involves reckless or callous indifference to the federally protected rights of others").

## VII. CLAIMS AGAINST THE FEDERAL DEFENDANTS

### A. TENTH CAUSE OF ACTION
### Failure to Exercise Emergency Powers Under SDWA § 1431, 42 U.S.C. § 300i
### (Against U.S. EPA, Zeldin, and Mason in Their Official Capacities Only)

175. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

176. Defendants U.S. EPA, Zeldin, and Mason have received information that contaminants from the Incident are present in or have entered the public water system serving Roseland, Louisiana, and that these contaminants present an imminent and substantial endangerment to the health of persons.

177. Despite this knowledge, Defendants U.S. EPA, Zeldin, and Mason have failed to take actions necessary to protect public health, including issuing emergency orders, requiring alternative water supplies, or commencing a civil action for injunctive relief and civil penalties against Smitty's, in violation of the mandatory duties under SDWA § 1431, 42 U.S.C. § 300i.

178. As the court held in *Burgess v. United States*, 375 F. Supp.3d 796, 809–16 (E.D. Mich. 2019), EPA's failure to timely intervene and respond to drinking water contamination is not shielded by the discretionary function exception when the agency's conduct involves objective, scientific, and professional assessments rather than policy issues. The court stated it "cannot conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning." *Id.* at 816.

179. This Cause of Action is brought against Defendants U.S. EPA, Zeldin, and Mason solely in their official capacities and seeks only prospective injunctive and declaratory relief compelling these Defendants to exercise the mandatory emergency powers conferred by SDWA § 1431, 42 U.S.C. § 300i, with respect to the public water system serving the Millers' property,

including issuance of an emergency order and provision of alternative water supplies until the water supply is confirmed safe by independent testing. Plaintiffs do not seek, and this Cause of Action does not provide a basis for, an award of money damages against Zeldin or Mason in their official capacities, which would be barred by sovereign immunity.

### B. ELEVENTH CAUSE OF ACTION
### Failure to Act Under SDWA § 1414, 42 U.S.C. § 300g-3
### (Against U.S. EPA, Zeldin, and Mason in Their Official Capacities Only)

180. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

181. Once Defendants U.S. EPA, Zeldin, and Mason determine that a public water system does not comply with applicable SDWA requirements, they are obligated under § 1414(a)(1)(A), 42 U.S.C. § 300g-3(a)(1)(A), to notify the state and public water system and provide advice and technical assistance.

182. When, beyond the thirtieth day after such notification, the state has not commenced appropriate enforcement action, § 1414(a)(1)(B), 42 U.S.C. § 300g-3(a)(1)(B), requires U.S. EPA to "issue an order" or "commence a civil action."

183. The Federal Defendants' failure to act in compliance with the SDWA's mandatory duties in response to the Incident constitutes a violation of the SDWA that is actionable by Plaintiffs.

184. This Cause of Action is brought against Defendants U.S. EPA, Zeldin, and Mason solely in their official capacities and seeks only mandatory prospective injunctive and declaratory relief compelling these Defendants to issue the order or commence the civil action required under SDWA § 1414(a)(1)(B), 42 U.S.C. § 300g-3(a)(1)(B), with respect to the noncompliance of the public water system serving the Millers' property. Plaintiffs do not seek, and this Cause of Action does not provide a basis for, an award of money damages against Zeldin or Mason in their official capacities. Rather, they seek a mandatory prospective injunction commanding the Federal

Defendants to investigate and evaluate the Roseland Public Water System to assess that it is uncontaminated and functioning.

### C. TWELFTH CAUSE OF ACTION
### Administrative Procedure Act — Arbitrary and Capricious Action Under 5 U.S.C. §§ 701–706 (Against U.S. EPA, Zeldin, and Mason in Their Official Capacities)

185. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

186. The Federal Defendants' failure to act and their issuance of misleading public assurances constitute final agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

187. The Federal Defendants' withholding of action that is unlawfully withheld or unreasonably delayed is reviewable under 5 U.S.C. § 706(1).

188. This Cause of Action is brought against Defendants U.S. EPA, Zeldin, and Mason solely in their official capacities and seeks only prospective and remedial equitable relief under 5 U.S.C. § 706(1)–(2), including an order compelling U.S. EPA to complete its unreasonably delayed determinations under SDWA § 1414 with respect to the Millers' water supply, an order directing U.S. EPA to conduct independent, court-supervised environmental testing and other investigations at and around the Millers' property, and an order requiring the misleading statements made by the Federal and State Governments be publicly retracted, and setting aside as arbitrary and capricious any final agency action or public communication found to have misrepresented the nature or extent of the contamination. Plaintiffs do not seek, and this Cause of Action does not provide a basis for, an award of money damages against Zeldin or Mason in their official capacities, consistent with the APA's limitation of its sovereign-immunity waiver to relief "other than money damages." 5 U.S.C. § 702.

### D. THIRTEENTH CAUSE OF ACTION
### Fifth Amendment — Substantive Due Process
### (Against Zeldin and Mason in Their Individual Capacities)

***Pleaded in the Alternative Under Fed. R. Civ. P. 8(d)(2)***

189. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

190. Plaintiffs plead this Cause of Action in the alternative and as a secondary basis for relief only, pursuant to Federal Rule of Civil Procedure 8(d)(2), which permits a party to state alternative or hypothetical claims regardless of consistency. Plaintiffs assert this Cause of Action solely in the event the Court declines to apply the § 1983 joint-action theory to Defendants Zeldin and Mason, and nothing in this Cause of Action concedes that a new *Bivens* context would not properly be recognized on these facts.

191. Defendants Zeldin and Mason, acting in their individual capacities as federal officials, engaged in conduct that violated Plaintiffs' Fifth Amendment right to substantive due process and bodily integrity. U.S. Const. amend. V. As set forth in detail above, this conduct included their failure to exercise emergency powers, their failure to warn, and their affirmative issuance of misleading assurances concerning the safety of the drinking water supply and conditions in Roseland.

192. The conduct of Defendants Zeldin and Mason constitutes deliberate indifference to the known and substantial risk of serious harm posed by contamination of the Roseland drinking water supply and other environmental conditions in Roseland at the time. By issuing false assurances while concealing operative facts, these Defendants stripped Plaintiffs of the ability to decide for themselves how to protect their health in violation of their Fifth Amendment rights.

193. A damages remedy is available against Defendants Zeldin and Mason in their individual capacities under the doctrine of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), and its progeny, to the extent a *Bivens* remedy is recognized for the constitutional violations alleged herein. Plaintiffs are entitled to compensatory

damages, including damages for mental anguish, and punitive damages for the willful, wanton, and conscience-shocking violation of their constitutional rights.

## VIII. CLAIMS AGAINST THE STATE DEFENDANTS

### A. FOURTEENTH CAUSE OF ACTION
**Failure to Enforce SDWA Requirements 42 U.S.C. § 300j-8**
**(Against LDEQ, Burdette, and Dr. Vincent)**

194. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

195. Defendants LDEQ, Burdette, and Dr. Vincent have failed to ensure compliance with applicable SDWA requirements, including maximum contaminant levels, treatment technique requirements, monitoring and testing protocols, and public notification requirements at 40 C.F.R. Part 141. This failure constitutes a violation of the SDWA actionable against the State Defendants.

196. As recognized in *Mich. Dep't of Env't Quality v. City of Flint*, 282 F. Supp. 3d 1002, 1012–13 (E.D. Mich. 2017), state drinking water regulations enacted pursuant to the SDWA's cooperative federalism framework constitute federal requirements enforceable in federal court.

197. Their failure is actionable. The Millers hereby seek a mandatory prospective injunction requiring LDEQ to comply with their duties in managing and operating the State and Roseland's public water systems.

### B. FIFTEENTH CAUSE OF ACTION
**Failure to Provide Adequate Public Notice Under SDWA**
**(Against LDEQ, Burdette, and Dr. Vincent)**

198. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

199. Defendants LDEQ, Burdette, and Dr. Vincent have failed to ensure adequate public notice of the contamination and health risks in compliance with the SDWA's public notification requirements at 40 C.F.R. §§ 141.201–141.211.

200. The Millers seek a mandatory prospective injunction requiring LDEQ to correct prior inaccurate statements and provide an accurate public notice to inform the public of the condition of the State's and Roseland's public water supplies.

**C. SIXTEENTH CAUSE OF ACTION**
**Failure to Exercise Regulatory and Enforcement Authority Under LEQA**
**(Against LDEQ, Burdette, and Dr. Vincent)**

201. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

202. Under the LEQA, La. R.S. 30:2001 *et seq.*, Defendants LDEQ, Burdette, and Dr. Vincent have broad authority and responsibility to protect public health, including authority to regulate discharges of pollutants (La. R.S. 30:2014), enforce water quality standards (La. R.S. 30:2076), regulate hazardous waste (La. R.S. 30:2025), and take emergency action.

203. Defendants LDEQ, Burdette, and Dr. Vincent have failed to exercise this authority in a timely and adequate manner in response to the contamination resulting from the Incident.

204. The Millers herein seek a mandatory prospective injunction requiring LDEQ to enforce the laws and regulations related to Smitty's including those set forth above.

**D. SEVENTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of Fourteenth Amendment Substantive Due Process**
**(Against Burdette and Dr. Vincent)**

205. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

206. Defendants Burdette and Dr. Vincent, acting under color of state law within the meaning of 42 U.S.C. § 1983, engaged in conduct that constitutes deliberate indifference to the known and substantial risk of serious harm posed by contamination of the Roseland environmental conditions and the drinking water supply. Defendants Burdette and Dr. Vincent are sued in both their individual and official capacities.

207. As held in *Concerned Pastors for Social Action v. Khouri*, 194 F. Supp. 3d 589, 604–06 (E.D. Mich. 2016), state officials who exercise operational and financial control over a public water system may be held liable under the SDWA and subject to prospective injunctive relief under the *Ex parte Young* doctrine, 209 U.S. 123, 159–60 (1908), notwithstanding the Eleventh Amendment. Claims for prospective injunctive relief against Defendants Burdette and Dr. Vincent in their official capacities are not barred by the Eleventh Amendment because they seek to compel these officials' future compliance with federal law and duties.

208. State officials who knowingly expose residents to environmental conditions and contaminated water during and after the Incident while failing to act or providing misleading assurances may face liability under the Fourteenth Amendment for violating the constitutional right to bodily integrity.

209. Defendants Burdette and Dr. Vincent, with knowledge of the severity of contamination, and the actually contaminants released made comforting but misleading statements that understated impacts and failed to identify PFAS and other contaminants, thus constituting conscience-shocking conduct, under the circumstances and the knowledge of Defendants at the time.

210. Plaintiffs are entitled to prospective injunctive relief against Defendants Burdette and Dr. Vincent in their official capacities. Plaintiffs are also entitled to compensatory damages, including damages for personal injury, medical monitoring and other costs, mental anguish, and punitive damages against Defendants Burdette and Dr. Vincent in their individual capacities for the willful, wanton, and conscience-shocking violation of Plaintiffs' constitutional rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

## IX. ADDITIONAL STATE-LAW TORT CLAIMS AGAINST THE SMITTY'S

**DEFENDANTS**

### A. EIGHTEENTH CAUSE OF ACTION
### Louisiana Civil Code Article 2317.1
### Strict Liability for Defective Things

211. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

212. At all relevant times, Smitty's, through Defendants Tate, Lorio, Ellison, and Smith, had custody, control, and ownership of the Facility and all tanks, containment systems, piping, and other appurtenances therein. La. Civ. Code art. 2317.1.

213. The Facility posed an unreasonable risk of harm due to defects in construction, design, maintenance, operations and/or condition of the storage tanks, containment systems, and related equipment throughout .

214. These defects, inadequacies and conditions were causes-in-fact of the Incident and resulting damages to Plaintiffs.

215. Plaintiffs are entitled to all compensatory damages, including personal injuries, mental anguish, against all Smitty's Defendants, including Defendants Tate, Lorio, Ellison, and Smith in their individual capacities, and the severity of these damages is informed by the Smitty's Defendants' wanton and reckless disregard for the rights and safety of others, as more fully alleged in the Severity of Conduct allegations above, for the reasons discussed therein.

### B. NINETEENTH CAUSE OF ACTION
### Trespass

216. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

217. The Smitty's Defendants, by their acts and omissions, caused hazardous substances, soot, smoke, oil, chemicals, and other pollutants to physically invade and deposit upon Plaintiffs' property without Plaintiffs' consent, constituting a trespass under Louisiana law, La. Civ. Code art. 2315, and civil law.

218. This trespass has interfered with and continues to interfere with Plaintiffs' exclusive possession, use, and enjoyment of their property.

219. Plaintiffs are entitled to compensatory damages, including damages for diminution in value and restoration of the Property and mental anguish, with the severity of these damages informed by the Smitty's Defendants' reckless and wanton disregard for the rights and safety of others, as more fully alleged in the Severity of Conduct allegations above.

220. Based on the Smitty Defendants' knowledge of repeated failures to comply with law, the Smitty Defendants knew the result of their conduct could be a catastrophic event. In this regard, Smitty's conduct was intentional.

### C. TWENTIETH CAUSE OF ACTION
### Loss of Consortium

221. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

222. As a result of the injuries and damages caused by the Smitty's Defendants' conduct, each Plaintiff has suffered loss of consortium, companionship, love, affection, society, and services of the other. La. Civ. Code art. 2315.

223. The Millers seek their actual damages, expenses, loss of society and loss services.

## X. CLAIMS AGAINST ALL DEFENDANTS

### A. TWENTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiffs of Fourteenth Amendment Rights to Bodily Integrity and Substantive Due Process (Against All Defendants)

224. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

225. This Cause of Action is for individual-capacity compensatory and punitive damages against Defendants Zeldin and Mason. It rests on 42 U.S.C. § 1983 and the settled joint-action doctrine recognized in *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980), and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970), and requires no recognition of a new *Bivens* context.

Federal officials who conspire or act jointly with state officials may be held liable under § 1983 as though acting under color of state law. *See, e.g.*, *Jorden v. National Guard Bureau*, 799 F.2d 99, 111 n.17 (3d Cir. 1986) ("federal officials who conspire or act jointly with state officials may be liable" under § 1983 (citing *Knights of the Klu Klux Klan v. East Baton Rouge Parish,* 735 F.2d 895, 900 (5th Cir.1984)).

226. At all times relevant to this cause of action, Defendants Burdette and Dr. Vincent were state officials acting under color of state law within the meaning of 42 U.S.C. § 1983. Defendants Zeldin and Mason were federal officials who, by acting jointly and in concert with Defendants Burdette and Dr. Vincent in the specific manner described herein on behalf of U.S. EPA, and in the following paragraphs — including by jointly conducting response operations at the Facility, jointly collecting and analyzing sampling data, jointly drafting and issuing inaccurate coordinated public communications, and jointly deciding when and what to disclose to the Millers and the public — are deemed to have acted under color of state law for purposes of § 1983 as "willful participant[s] in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The Smitty's Defendants, including Defendants Tate, Ellison, Lorio, and Smith, are likewise subject to § 1983 liability to the extent they acted as willful participants in the conspiracy with state (and federal) actors. *Dennis*, 449 U.S. at 27–28.

227. Between August 22, 2025 and the present, Defendants entered into an agreement, understanding, meeting of the minds or coordinated course of conduct to conceal from the Millers and other affected residents the true nature, extent, and severity of the contamination resulting from the Incident, and to issue false and misleading public assurances of safety while withholding more accurate, truthful information, or failing to establish operative sampling data, test results, and

health-critical information to support their public statements. The limited scope of sampling and the decision not to sample for constituents at the Facility know to have been discharged, emitted, and released. Such chemicals include those in Smitty's inventory or raw materials, and those identified in Smitty's Emergency Planning and Community Right-to-Know Act ("EPCRA") filings. In addition, Defendants had at their convenience witnesses, Safety Data sheets, and production information identifying the chemicals at Smitty's and released into the environment. This agreement, whether tacit or express, constitutes a conspiracy within the meaning of 42 U.S.C. § 1983.

228. The conspiracy was directed at depriving the Millers of their clearly established Fourteenth Amendment right to bodily integrity and substantive due process. U.S. Const. amend. XIV, § 1. It is well established government officials violate the constitutional right to bodily integrity when they knowingly expose residents to life-threatening contaminants while concealing the danger or providing misleading assurances of safety. *See Guertin v. Michigan*, 912 F.3d 907, 920–21, 926–29 (6th Cir. 2019); *In re Flint Water Cases*, 960 F.3d 303, 324, 329 (6th Cir. 2020); *Boler v. Earley*, 865 F.3d 391, 408-09, 413 (6th Cir. 2017).

229. In furtherance of the conspiracy, Defendants committed the following overt acts, among others:

230. From the earliest days following the Incident, Defendants U.S. EPA, Zeldin, Mason, LDEQ, Burdette, and Dr. Vincent had access to employees of Smitty's, information demonstrating the chemicals in the Facility, would have inevitably been released into the environment doing the explosion, fire, and cleanup. Sampling data, test results, and field observations demonstrating that hazardous substances — including heavy metals, volatile organic compounds, PFAS, and other contaminants — had been released into the air, soil, surface water,

groundwater, and drinking water supply serving Roseland, Louisiana in concentrations exceeding the maximum contaminant levels established under the SDWA's National Primary Drinking Water Regulations, 42 U.S.C. § 300g-1, and 40 C.F.R. § 141.1 et seq. and other relevant limits. Despite this knowledge, these Defendants withheld the operative, informative, and accurate data from the Millers and the public.

231. Defendants U.S. EPA, Zeldin, Mason, LDEQ, Burdette, and Dr. Vincent issued public statements and communications that were comforting in tone but materially misleading in substance, understating the concentrations and geographic extent of hazardous contamination, failing to identify whether PFAS were in the firefighting foam or Smitty's raw materials or inventory. Defendants acted with conscious indifference and intent when — electing to investigate only a small percentage of the contaminants that were released, and then affirmatively representing with false certainty conditions were safe when the Defendants knew or should have known they were not. These misleading assurances induced the Millers to remain at the Millers' property and led to their animals ingesting contaminated water and feed, and breathing contaminated air, without informed consent.

232. Defendant Smitty's, through Defendants Tate, Ellison, Lorio, and Smith, participated in the conspiracy by withholding from the public and from regulatory officials complete and accurate information regarding the hazardous substances stored, handled, and released at the Facility, including information available from Smitty's EPCRA filings, employee firsthand knowledge, safety data sheets, product inventories, and knowledge of the materials used to fight the fire. U.S. EPA's October 2025 RCRA inspection confirmed Smitty's had failed to make hazardous waste determinations on container contents and released materials, had failed to maintain adequate records, and had reported that hard copies of hazardous waste manifests were

lost in the fire. *See* Exhibit C at 13-17. The failure of the Defendants to provide complete and accurate information facilitated the Federal Defendants' and State Defendants' ability to issue misleading public assurances based on incomplete data.

233. The coordinated nature of the conspiracy is further demonstrated by the fact that U.S. EPA and LDEQ jointly conducted response operations at the Facility, jointly collected and analyzed sampling data, jointly communicated with the public regarding health and safety, and jointly managed the transition of onsite response management back to Smitty's on October 15, 2025 — all while failing to disclose the full scope of contamination to the affected residents. *See* Exhibit C at 1–2 (documenting joint EPA and LDEQ participation in the RCRA inspection). The parallel nature of the misleading assurances, the synchronized timing of information releases, and the consistent pattern of understatement across federal, state, and private-party communications support a reasonable inference that these actions were the product of a coordinated agreement rather than independent decision-making.

234. The conduct of the conspirators shocks the conscience within the meaning of *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–49 (1998). The conscience-shocking standard is met here because the Defendants' concealment and misleading conduct was not the product of split-second decision-making in an emergency but was instead undertaken over extended periods of deliberation, during which the Defendants had ample time to weigh their options and choose a different course. *See id.* at 851–54 (distinguishing "actual deliberation" from hurried action and holding that deliberate indifference may suffice to shock the conscience when officials have time to deliberate). The Defendants chose concealment and false assurances over transparency and public protection, and they did so on more than one occasion, consistently, and without legitimate government purpose.

235. As the court held in *Williams v. City of Jackson*, 663 F. Supp. 3d 624, 642 (S.D. Miss. 2023), "[w]ithout accurate information about the severity of the water crisis, the plaintiffs could not weigh the risks or make an informed choice about their water consumption. In a very real way, the Defendants' actions stripped the Plaintiffs of the ability to decide for themselves how they would protect their health." The same is true here. By concealing the severity of the contamination while affirmatively assuring the Millers conditions were safe, the Defendants deprived the Millers of the ability to make informed decisions about their own health and safety — including, *inter alia*, whether to evacuate, seek alternative water, avoid outdoor exposure, or obtain medical evaluation.

236. As a direct and proximate result of the conspiracy and the overt acts committed in furtherance thereof, the Millers have suffered and continue to suffer involuntary exposure to hazardous substances, personal injury, acute and chronic health effects, loss of access to safe drinking water, contamination of their property and livestock, emotional distress, mental anguish, anxiety, and fear of future health consequences, all as more fully described above.

237. The individual Defendants' conduct was willful, wanton, and in reckless or callously indifference to the Millers' federally protected rights. Plaintiffs are entitled to compensatory damages, including damages for mental anguish, against all Defendants who participated in the conspiracy. Plaintiffs are further entitled to punitive damages against Defendants Tate, Ellison, Lorio, Smith, Zeldin, Mason, Burdette, and Dr. Vincent in their individual capacities. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages are available under § 1983 when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").

## XI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Randall I. Miller and Brenda D. Miller respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

**A.** Declare that Smitty's Supply, Inc., the SACDs, and Defendants Tate, Ellison, Lorio, and Smith have violated and continue to violate the CAA, CERCLA, RCRA, the SDWA, the LEQA, and the Louisiana Civil Code;

**B.** Declare that U.S. EPA and Defendants Zeldin and Mason have violated their mandatory duties under the SDWA, including §§ 1414 and 1431, and under the APA;

**C.** Declare that LDEQ and Defendants Burdette and Dr. Vincent have failed to meet their primary enforcement responsibility under the SDWA and have violated applicable federal and state environmental laws;

**D.** Enter a mandatory prospective injunction requiring the Smitty's Defendants to immediately undertake complete investigation — including a proper RI/FS determining the horizontal and vertical extent of contamination at the Facility, as that term is defined under CERCLA — cleanup and remediation of all contamination affecting Plaintiffs' property, including water supply, groundwater, surface water, soil, air quality, and plant growth, to appropriate U.S. EPA and LDEQ standards protective of human health and the environment;[6]

---

[6] Rule 65(c) of the Federal Rules of Civil Procedure typically requires a party that seeks a restraining order or preliminary injunction to provide security, typically in the form of a bond, to pay for costs and damages sustained by a wrongfully enjoined or restrained party. However, in light of the important public interest and constitutional protections, the bond requirement may be waived or only a nominal bond may be required. *See Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002)); *Sierra Club v. Froehlke*, 359 F. Supp. 1289, 1386 (S.D. Tex. 1973), *rev'd on other grounds*, 499 F.2d 982 (5th Cir. 1974).

Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff respectfully requests that the Court waive the security requirement or impose a nominal bond.

**E.** Enter injunctive relief compelling Defendants U.S. EPA, Zeldin, and Mason to exercise their emergency powers under SDWA § 1431 to protect the health of the residents of Roseland;

**F.** Enter prospective injunctive relief under the *Ex parte Young* doctrine, 209 U.S. 123, 159–60 (1908), compelling Defendants Burdette and Dr. Vincent in their official capacities to take all necessary enforcement actions to ensure compliance with the SDWA, RCRA, CERCLA, LDEQ and the Louisiana Code and their implementing regulations;

**G.** Order Defendants U.S. EPA, Zeldin, Mason, LDEQ, Burdette, and Dr. Vincent to ensure the provision of safe alternative water supplies to Plaintiffs until it is confirmed by independent testing the water supply is fully restored to compliance with all applicable drinking water standards and is truly safe to drink;

**H.** Order Defendants U.S. EPA, Zeldin, and Mason, in their official capacities, to conduct or direct independent, court-supervised environmental testing and monitoring of the soil, water supply, groundwater, surface water, air quality, and sediment at and around Plaintiffs' property, and order the Smitty's Defendants to fund and facilitate comprehensive third-party environmental testing and monitoring of Plaintiffs' property and any nearby contaminated property that may be impacting Plaintiffs or the Property;

**I.** Order the establishment and funding of a comprehensive medical monitoring program for Plaintiffs, including baseline health assessments, periodic testing for the presence of hazardous substances, cancer screening, neurological evaluation, liver and renal function screening, and testing for mental acuity and cognitive decline;

**J.** Determine and order Smitty's has created a nuisance, the effects of which continue today and continue to harm the Millers causing discomfort, annoyance, personal injury, and diminution in property value.

**K**. Determine Smitty's have intentionally and /or negligently trespassed onto Plaintiffs' property and caused damage including diminution in value.

**L.** Award Plaintiffs all compensatory damages, past and future, including but not limited to: medical expenses; costs of alternative water supplies; costs of environmental testing and sampling; property damage; diminution in property value; loss of livestock; loss of use and enjoyment of property; loss of use of the Tangipahoa River; economic losses; emotional distress; personal injury and mental anguish;

**M.** Award Plaintiffs the costs of medical monitoring, including baseline health assessments and periodic diagnostic testing reasonably necessitated by Plaintiffs' exposure to hazardous substances, as a separate and independently compensable item of damages distinct from the medical monitoring program sought as injunctive relief in Paragraph I above;

**N.** Award Plaintiffs the costs of temporary or permanent relocation and alternative housing incurred and to be incurred as a result of the Incident and the ongoing contamination of Plaintiffs' property, as necessary costs of response under CERCLA § 101(23), 42 U.S.C. § 9601(23);

**O.** Award Plaintiffs the cost of restoring their real, personal property and improvements to its pre-Incident condition to the extent reparable, and the diminution in value of their property to the extent not reparable, plus the loss of use and enjoyment of their property for the period of harm;

**P.** Award Plaintiffs damages for loss of consortium, companionship, affection, and society, and services, as alleged above.

**Q.** Award Plaintiffs damages commensurate with the severity of the Smitty's Defendants' gross negligence, wanton and reckless disregard for public safety, and intentional misconduct, including Defendants Tate, Ellison, Lorio, and Smith in their individual capacities as reflected in the compensatory damages sought herein;

**R.** In the alternative, and only to the extent the Court declines to apply the § 1983 joint-action theory pleaded above, award Plaintiffs compensatory and punitive damages against Defendants Zeldin and Mason in their individual capacities for willful, wanton, and conscience-shocking violations of Plaintiffs' Fifth Amendment rights to bodily integrity and substantive due process, pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397 (1971);

**S.** Assess civil penalties against Smitty's Supply, Inc. for each day of violation of the CAA, RCRA, the SDWA, and the LEQA, in the maximum amounts authorized by law;

**T.** Award Plaintiffs all response costs incurred and to be incurred under CERCLA against the Smitty's Defendants and Defendants Tate, Ellison, and Lorio in their capacities as arrangers and generators under CERCLA § 107(a)(3);

**U.** Award Plaintiffs their costs of litigation and attorneys' fees pursuant to 42 U.S.C. § 300j-8(d), 42 U.S.C. § 7604(d), 42 U.S.C. § 6972(e), 42 U.S.C. § 1988, and all other applicable authority;

**V.** Order the Smitty's Defendants and the SACDs to implement best practices to prevent future releases of hazardous substances, including enhanced spill and containment procedures, safety protocols, and emergency response planning;

**W.** Enjoin all Defendants from making further misleading statements concerning the nature, extent, or safety of the contamination while concealing operative facts;

**X.** As Plaintiffs' primary basis for individual-capacity relief including compensatory and punitive damages against Defendants Zeldin and Mason, in addition to relief from the Federal Defendants and State Defendants award Plaintiffs compensatory damages, including damages for mental anguish, and punitive damages against Defendants Tate, Ellison, Lorio, Smith, Zeldin, Mason, Burdette, and Dr. Vincent in their individual capacities for their participation in the

conspiracy to conceal the nature, extent, and severity of contamination and to issue false and misleading public assurances of safety in violation of the Millers' Fourteenth Amendment rights to bodily integrity and substantive due process, pursuant to 42 U.S.C. § 1983 and *Smith v. Wade*, 461 U.S. 30, 56 (1983); enter injunctive relief prohibiting all Defendants from continuing to withhold sampling data, test results, or health-critical information from the Millers and other affected residents, and requiring the immediate disclosure of all such information; and award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

**Y.** Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**GORDON, ARATA, MONTGOMERY, BARNETT, McCOLLAM, DUPLANTIS & EAGAN, LLC**

By: */s/ Terrence K. Knister*

A. Gregory Grimsal (Bar No. 6332)
E-mail: ggrimsal@gordonarata.com
Terrence K. Knister (Bar No. 7755)
E-mail: tknister@gordonarata.com
201 St. Charles Avenue, 40th Floor
New Orleans, LA 70170
Telephone: (504) 582-1111
Facsimile: (504) 582-1121

And

**MUNSCH HARDT KOPF & HARR, P.C.**
Frederick W. Addison, III (TX Bar No. 00903350)
E-mail: raddison@munsch.com
Randall W. Miller (TX Bar No. 24092838)
E-mail: rwmiller@munsch.com
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

*Attorneys for Plaintiffs*